5   319
30   132

# CHARTER OAK LIFE INSURANCE COMPANY, RESPONDENT, *v.* MATTHEW T. GISBORNE, APPELLANT.

DECLARATION OF TRUST—RENTS, ISSUES AND PROFITS. -A declaration of trust given as security for sums of money advanced as purchase money for mining property, and to be satisfied out of the rents, issues and profits of the mine, without qualifying words, creates a lien upon the property itself and it may be sold to satisfy the lien.

ID.—STATUTE OF LIMITATIONS.—Where a declaration of trust provided for the payment of the money advanced out of the rents, issues and profits of a mine, and further provided for the obtaining of the rents, issues and profits, primarily, by working the mine, the indebtedness was not due immediately, and the statute did not begin to run until the trust was closed.

ID.—PAROL EVIDENCE—Parol evidence is admissible in an action to foreclose the deed of trust to show for whom the trustee was acting and who furnished the money, explaining what did not appear on the face of the declaration of trust, but what its language indicated to exist.

PRACTICE--CONTINUANCE.—The granting of a continuance is in the sound discretion of the court, and unless that discretion has been abused, the case will not be reversed, because a continuance was refused.

APPEAL from a judgment of the district court of the third district, and from an order refusing a new trial. The facts sufficiently appear from the opinion.

*Mr. Arthur Brown*, for appellant.

*Messrs. Marshall & Royle*, for respondent.

BOREMAN, J.:

This is an appeal from a judgment. In the spring of 1874, the appellant Matthew T. Gisborne, was the owner of one-third interest in the Mono mine, situated in the Ophir mining district, Tooele county, in this territory. He obtained a bond upon the other two-thirds from his co-owners, Embody, Miller, and Heaton, and then went to New York to

sell this two-thirds. Failing in this, he borrowed $100,000 with which to buy the interest of Embody, one of his co-owners, which was four-eighteenths of the mine. The money was furnished through defendant Stephens, trustee, and paid to Embody; and Embody made the deed of his interest to Gisborne. In return for the money thus advanced by Stephens, trustee, the appellant conveyed to him, by deed absolute on its face, all of its original interest, and all of the interest he had obtained from Embody, which two interests together amounted to ten-eighteenths of the mine. The money thus furnished came from Allen, Stephens & Co., of which firm Stephens was a member. Stephens, likewise, afterwards furnished $300,000 more, to enable Gisborne to buy the residue of the two-thirds of the mine; the same being the interests of Miller and Heaton, his co-owners in the mine. This money, according to agreement with Gisborne, was paid to his said co-owners in the mine, and the deed made to Gisborne; and then Gisborne, by deed absolute on its face, conveyed the same over to Stephens, trustee. Thus Stephens, trustee, held the title to the whole of the mine. Thereupon Stephens, in accordance with the wishes of Gisborne, made a declaration of trust, showing that the two deeds above mentioned, of Gisborne to Stephens, trustee, were not in fact absolute deeds, although on their faces they appeared to be such, but were made upon trusts, and that Stephens held the property in trust to receive the "rents, issues, and profits" of the mine, and to pay therefrom the expenses of operating the mine; then to pay back the $400,000 obtained through Stephens, trustee; then to pay Gisborne a percentage on a third of the rents, issues, and profits; and to pay Gisborne $275,000. After these several amounts should be paid, then the trustee, Stephens, was to cancel the two deeds referred to on the record; thus, according to the declaration of trust, leaving the title to the whole property finally in Gisborne. He, by a subsequent contract with Hussey, agreed to convey half of the mine to Hussey for money and services rendered; and afterwards, Hussey transferred said half interest to Stephens individually. The trustee entered upon the discharge of his duties in carry-

ing out the trust; but the amount of ore that could be obtained from the mine decreased so rapidly that the whole output of the mine after the trustee took hold of it, only netted some $20,000, and thereafter failed completely, the vein being lost. The work on the mine was done, under the trustee, by two managing agents specified in the declaration of trust—the one being chosen by Gisborne, the other by the trustee. In a fruitless endeavor to find the ore vein there were heavy expenditures, amounting to nearly $52,000 beyond the ability of the trustee to pay. The debts thus incurred were not paid by the trustee, but were taken up by the respondent, to whom they were assigned. Allen, Stephens & Co. assigned their claims, also, to the respondent, including the claim of $400,000 above referred to, and advanced through Stephens, trustee. The present action was brought to subject the mining property itself to the payment of the whole indebtedness, and that the same might be declared to be charges and liens thereon. Gisborne, one of the defendants, contests the right of respondent to this. The judgment of the district court being in favor of the respondent, the appellant, Gisborne, has brought the case to this court by appeal from that judgment. The appellant contends that the claims set up as the basis of the complaint are not debts against him or the mine, and have never existed as such; that the $400,-000 never were a debt at all, but were purchase money. He urges that, if such claims ever existed as debts, it was against the "rents, issues, and profits" of the mine, and that the "rents, issues and profits" do not include the property itself, or the sale thereof. No personal judgment is sought against the appellant. Whether, therefore, the claims ever existed as debts against him personally, is, in this action, not material.

The first question, then, for our consideration, is whether the $400,000 were purchase money or not. The appellant claims that the whole transaction showed that a purchase of the property, or of two-thirds thereof, by Stephens, trustee, was the aim and object of the parties, and that Gisborne was only security in the matter, and helping Stephens to make his purchase. Gisborne went to New

York, it appears, among strangers, if this theory be true, to help a stranger to buy two-thirds of the mine from his co-owners. Gisborne, however, in his testimony, says that when he went to New York he first talked of making the sale of the two-thirds upon which he held a bond, but that he failed to make the sale. He then borrowed $100,000, and afterwards $300,000 more were advanced through the same channel. If a sale to Stephens, trustee, was the intention, we are unable to see why the whole of the mine was conveyed to Stephens, trustee, when he was only buying two-thirds. Nor do we see that there was any necessity for the declaration of trust. An absolute deed of two-thirds of the mine by Gisborne to Stephens, trustee, would have answered every purpose. But it would seem that the question whether the $400,000 were a loan or purchase money is settled by the requirement set forth in the declaration of trust; that this $400,000 was to be paid back to the party who advanced it; and that Stephens, trustee, was not to hold the mine after the sums of money specified in the declaration of trust had been paid, but the title to the whole mine was to revert to Gisborne. The parties who furnished the money through Stephens, trustee, were to have nothing further to do with the property after they should get back the money which they had advanced. If the title of the mine was to revert to Gisborne, it could not have been a sale to Stephens, nor to Allen, Stephens & Co. The provision in the declaration of trust, that Gisborne was to have title to the property after the payment of the sums of money thereinafter specified, wholly precludes the idea that at that time the parties contemplated a purchase of the property, or of two-thirds of it by Stephens, or by Stephens, trustee, or by Allen, Stephens & Co. The idea of a sale, and that the purchaser was not to get the title, are not consistent.

But it is said that we should consider what was to take place after these sums were paid off, and the title placed in Gisborne; and that, if this were done, a sale would appear to have been the ultimate object of the whole transaction. The evidence tends to show that subsequent to the payment of the sums referred to, and subsequent to the

title being placed in Gisborne, a conveyance was to be made by Gisborne to Hussey of one-half of the mine, and that thereafter Hussey was to convey such half interest to Stephens individually. We do not think that we are authorized to consider these matters which were to occur after the payment of the sums referred to, and after the title should be placed in Gisborne, unless they were parts of the contract or transaction of which the declaration of trust was the "final act;" for it does not appear, nor is it claimed, that after the execution of the declaration of trust there was any new contract between Gisborne and Stephens, or any alteration in the old contract. The two deeds by Gisborne to Stephens, trustee, and the declaration of trust which followed, embodied the terms of the contract between the parties. We can, perhaps, consider the oral statements prior to and contemporaneous with these written contracts, in order to arrive at a correct interpretation of them wherever the meaning is doubtful; but when the proof shows, and it is admitted, that the declaration of trust was the final act, it is not competent for us to allow that, by any oral evidence, the plain letter of the written contract can be contradicted or changed; nor can we consider what may have occurred after the execution of the declaration of trust. But if the $400,000 be treated as purchase money, and the whole transaction treated as a conveyance to Stephens of the one-half of the mine, or of thirteen-eighteenths of it, yet such purchase could not result in a transfer of the title for any interest to Stephens until the purchase money had been paid back to him, or to those who furnished it through him. The buyer, according to the theory of appellant, was to have no title until all the purchase money which he had paid should be returned to him. That would be an anomalous proceeding, yet exactly what would have occurred if the transaction were a sale of the property to Stephens, and not a loan of money by him, or those acting through him; and, if the purchaser was to have no title until the purchase money was paid back to him, we are at a loss to see what was to be, or could be, the consideration for the transfer of the title to the purchaser. With the purchase money all paid

back, it is evident that no consideration for a conveyance of the title to the purchaser existed. In reason and equity, it would seem that when the $400,000, the only consideration mentioned in the transaction, should be paid back, the title to the property would revert to the seller. If Embody, Heaton, and Miller, therefore, were the sellers, as is claimed, the title would naturally fall to them in such a contingency. But the contract expressly provides that the title shall go to Gisborne, and not to Embody, Heaton, and Miller. The conclusion would be that he (Gisborne) was the seller, if the transaction was a sale; and that is what the face of the papers shows him to have been, if a sale took place. He is the one who made the deeds to Stephens; he is the one for whom the declaration of trust was made. The whole transaction shows that Embody, Heaton and Miller, the co-owners in the mine with Gisborne, were entirely out of the whole matter when they received the pay for their interests. Such interests were two-thirds of the mine, and not simply two-thirds of the rents, issues and profits. They lay no claim to any interests in the mine now, and the money that caused them to release their hold upon it, and convey their interests to Gisborne, came through Stephens, trustee; and the claim for the repayment of such money is one of the debts that this action is brought to enforce.

The contracts themselves between Gisborne and Hussey, and between Hussey and Stephens, are inconsistent with the idea of a sale to Stephens. The agreement of Stephens of May 30, 1874, to transfer to Hussey one-half of the property after the repayment of the debts or claims referred to, says that the deed was in consideration of "certain moneys advanced and services rendered to me in effecting the purchase of two-thirds of the Mono mining claim and lode from my late co-tenants." The transfer of that half-interest, therefore, to Hussey, and by Hussey to Stephens, had no connection whatever with the transactions between Gisborne and the trustee, prior to or simultaneously with the declaration of trust. It was simply an agreement of Gisborne's to convey to Hussey, in consideration of Hussey's services in negotiating the trade.

Whatever Hussey might do thereafter with the interests acquired was a matter of Hussey's own choice, and was immaterial to Gisborne. It had no bearing upon the disposition of the property as directed in the declaration of trust. The transfer by Hussey was not in pursuance of any agreement between Hussey and Gisborne, and Gisborne could not control Hussey in the matter of his disposing of his interests.

The agreement between Gisborne and Hussey took place on the thirtieth of May, 1874, the same day on which the declaration of trust was made. But the brief of appellant says (and the proof is to the same effect) that the declaration of trust was the "final act." The agreement between Gisborne and Hussey refers to the declaration as being already executed and delivered to Gisborne. This agreement, then, was subsequent to the "final act," and was no part of that transaction, and in no way connected with it. It further appears that the transfer of this half interest by Hussey to Stephens did not take place for several months after the execution and delivery of the declaration of trust, and of the agreement between Gisborne and Hussey. It, therefore, could not have had any bearing upon any of the transactions of the thirtieth of May, but was subsequent thereto, and independent thereof. Moreover, it was not a transaction to which Gisborne was a party. If ever a sale was contemplated to Stephens, it was when the two deeds, absolute on their face, were made by Gisborne to him; but, if the idea did then exist in their minds, it seems to us that it was entirely removed or obliterated by the declaration of trust, and that we are bound by the declaration of trust; and it clearly shows that there was no purchase, nor intended purchase, of any part of the mine by Stephens, or by those he represented, but that the money was loaned to Gisborne on the strength of the security given by the conveyance of the mine, as stated in the declaration of trust.

The question now arises whether the $400,000, and the other moneys referred to in the declaration of trust, were claims against the mine itself, or whether they were claims to be satisfied only out of the "rents, issues and profits"

of the mine. The declaration of trust, referring to the two deeds of conveyance by Gisborne to Stephens, trustee, says that "such conveyance was made and received upon the trusts, nevertheless, and to and for the uses, interests, securities, and purposes, hereinafter limited, specified, described, and declared; that is to say, upon trust to receive the rents, issues and profits of said premises, and to apply the same as received as follows, viz.," etc. Then followed in the declaration of trust the requirement to pay—*First*, the expenses of operating the mine, etc.; *second*, to pay the $400,000 back to Stephens, trustee; *third*, to pay Gisborne a percentage of one-third of the net proceeds of the mine, etc.; and *fourth*, to pay Gisborne $275.000. The appellant urges that the foregoing provisions for the trustee to receive the "rents, issues and profits" of the mine requires these various amounts to be paid out of the product —the ores—of the mine, and is a prohibition upon the taking of the mine itself to pay them.

This is not a case where the court is asked to make a new contract for the parties, but to give an interpretation and enforcement of a contract already made. The court is asked to declare that the contract made creates a lien upon the land itself. The mine had ceased to produce ore, and resort to a sale of the property itself was necessary, unless the trust had ceased, and all the property subject to a lien had been exhausted. It is not contended that the contract as made does not embody the agreement of the parties. Neither side says that anything was intended other than what the contract says. But appellant contends that the court below gave a wrong interpretation of that contract, and that it was never intended that the property itself was to be subject to the liens mentioned, or to be sold to satisfy them; and that the contract conveys no such idea or authority. It being admitted that the contract embodies the agreement of the parties, we must look to the contract itself to learn its meaning. Primarily, no doubt, the indebtedness was to have been paid out of the ores taken from the mine; but when the mine ceased to be productive this mode of paying the indebtedness failed. If the creditors could resort only to the "rents, issues and profits,"

and this meant only the ores, and they had ceased, the creditors had exhausted all their security. The meaning of the words "rents, issue., and profits" has often been before the courts; and by a long line of decisions the courts of chancery have declared that, unless these words be connected with other words which restrain the meaning of the terms to the rents, issues and profits as they arise, (as if the trust is to pay debts out of the annual rents), the courts will give the words a meaning broad enough to include the sale of the property itself. The strict meaning of the words, as opposed to land, is the annual rents, issues and profits; yet the courts hold that they should not be confined thereto, but should be taken, in a more enlarged sense, to include every mode by which land may be made to yield profits, out of which money so charged upon it may be taken, and, consequently, to include the sale of the property itself. The doctrine is · thus laid down broadly by Judge Story in his work on Equity Jurisprudence. It is likewise laid down in Perry on Trusts, in Hawkins on Wills, Powell on Mortgages, and in other works; citing an array of authorities: 2 Story, Eq. Jur., secs. 1064, 1064*a*; 1 Pow. Mortg. 60-80; Hawk. Wills, 120 *et seq.*; *New* v. *Nicoll*, 73 N. Y., 130, 131; 2 Perry, Trusts, pp. 168, 170, secs. 602*g*, 602*k; Fletch. Trustees, 56 *et seq.*

In the declaration of trust there were no such restraining words as the books seem to require in order to confine the meaning of the words "rents, issues and profits," to annual rents, issues and profits. The title to the mine is held by the trustee; and the trustee declares, in the declaration of trust referred to, that he holds it in trust to receive and pay out the "rents, issues and profits." · Under the authorities, therefore, as we have seen, he holds it to pay the indebtedness, not only out of the products of the mine, but also out of the sale of the property itself. We cannot avoid this conclusion; and this is a reasonable, just, and equitable conclusion, as the money was furnished mainly to buy the title for Gisborne, and the title ought to be held to pay it back. We do not think that a fair construction of the whole transaction shows that the par-

ties ever intended to confine the security for the repayment of the money solely to the products of the mine. They do not say so. Had such been the intention, it is reasonable to suppose that some words conveying that idea would have been inserted in the declaration of trust. The deeds of Gisborne to Stephens, trustee, conveyed the title, and conveyed it as security. If the sole security was to be the ores, there could have been no necessity for the conveyance of the title. A simple lease for the purpose of working the mine, and paying off the debts, would have been sufficient. It does not seem reasonable to suppose that it was intended that when the party loaning the money had the title, he was merely to hold the mine, and make the money out of the ores, and in case there were no ores he was yet to reconvey the title, and lose all he had loaned upon the security given by the deeds. If such had been the intention, it should have been expressly stated. The court cannot infer it. If we look solely to the naked equity of the case, we do not see that the position of the appellant can be maintained. A party loans money to buy property for another, and takes a conveyance of the title in trust to secure him, but is required to apply the first products of the property to repay the loan, and then to reconvey the title to the grantor. The lender is to hold the title, and pay himself out of the products of the property. It turns out that there are no products. Does equity require that he shall give up the title which was conveyed to him as security, and which his money bought for the grantor? This would give the grantor the whole property, when two-thirds of it were bought for him by the money of the creditor, and the creditor could get nothing. We do not think there is any equity in such a course, and a court of equity could not uphold it. If the appellant had come into court and laid claim to only one-third of the mine, looking at the naked equity of the matter, there might have been some equity in this claim.

It is further contended that if the indebtedness of $400,000, or the expense account of some $52,000, ever existed as charges against the mine, they have both long

since been barred by the statute of limitations, which requires action thereon to be begun in four years. No time is mentioned within which any of the indebtedness was to be paid. The declaration simply says that the indebtedness was to be paid out of the "rents, issues and profits." In the brief of the appellant it is said that "if suit can be maintained to forclose his interests now, it could have been maintained the next morning after the papers were signed." The question arises, then, whether suit could have been maintained the next morning after the papers were signed. There was no ore on hand, and no time to get any out. The whole terms of the declaration show that the indebtedness was to be paid only when time had been given to get out the ores and sell them, and it would be absurd to say that was to be done the next morning after the papers were signed. Yet that would have to be said if it be true that the suit could have been begun the next morning after the papers were signed. Is the converse of the proposition true? If suit could not have been maintained the next morning after the papers were signed, does it follow that it could not be maintained now? It is a general rule, no doubt, that, where no time for payment is specified, the debt is due immediately, and the statute of limitations begins to run immediately. No time is fixed in the declaration of trust for the payment of any of the indebtedness, and, if the rule be applicable, all of the indebtedness fell due upon its creation. But the tenor of the declaration of trust is against the application of the rule to any of this indebtedness. The declaration of trust provided for the payment of the claims out of the "rents, issues and profits;" and further provided for the obtaining of these "rents, issues and profits" primarily, by working the mine. If all of the $400,000 could have been taken out within a few hours, there would have been no necessity for going to New York to borrow it, nor spending many days in negotiation. It is clear that many months were expected to be used up in gathering out these "rents, issues and profits." The indebtedness, therefore, was not

due immediately, and the statute of limitations did not begin to run immediately.

It is a rule in regard to the statute of limitations, applicable in all cases, that the statute begins to run when the debt is due, and an action can be instituted upon it. The indebtedness in the present case did not, as we have seen, begin to run immediately; and the inquiry arises, when did it begin to run? The trustee does not set up the statute of limitations; nor does he claim to have disavowed the trust, nor to have held adversely; nor does it appear that he has ever disavowed the trust, or held the title adversely. We doubt whether one of the *cestuis que trustent* can do these things for him. But, assuming that he can, then, as there is no disavowal of the trust by the trustee, or any showing of his holding adversely, the rule is that the statute of limitations does not begin to run until the trust is closed. *Bacon* v. *Rives,*106 U. S., 99. The trust in this case has not been closed. We do not think it a sufficient answer to this to say that the trust could not be carried out; that the ore failed, and the trustees ceased working, by reason of lack of money to pay expenses. That is not the meaning of the word "closed" when applied to trusts. The trust cannot be closed until the work is accomplished. To say that the trust has run its course and is completed, because there are no "rents, issues and profits," is simply to say that the trust is accomplished because it could not be accomplished. The authority of the books is that the statute does not begin to run until the trust work is fully completed. So long as the trust exists, the statute cannot run. It cannot be said that the trust in this instance has been accomplished. The whole of the evidence shows that it was not done; and all efforts in that direction ceased at the very threshold of the business, by the loss of the ore vein, and the lack of funds to further prosecute the work,—the declaration of trust having made no provision to meet the extraordinary contingency which had arisen. The authorities produced are to the effect that, generally, when a trust upon real estate has been completed, the property reverts. When the trust is completed,—has accomplished its work, —then its course may be said to have been run, and, after

that period, the trustees have no duties in regard thereto to perform.   They would then have ceased, and the statute begun to run.   The trust held by the trustee, after his work is finished, is a dry trust, and it is his duty to convey the estate to the beneficial owner.   This rule is expressly recognized in the declaration of trust, which provides that the property shall pass, by conveyance from the trustee, back to Gisborne, after the expenses of working the mine, and after the $400,000 are paid to Stephens, and after $275,000 shall have been paid to Gisborne.   But neither the language of the declaration of trust, nor the general rule referred to, gives to Gisborne a right to the property, before all these things are done,—before all these sums are paid. At this point, then, when these sums should all be paid, his rights would begin, according to the terms of the declaration of trust.   But that time has never arrived.

The trust in this case is an express one.   It is declared by the parties in the declaration of trust.   1 Perry, Trusts, 24; Laws Utah, 1884, p. 192, sec. 226.   The trust was also intended to continue indefinitely.   It is a continuing trust. In such cases the statute of limitations does not apply.   2 Perry, Trusts, sec. 863, and notes; *Oliver* v. *Piatt,* 3 How., 411; Ang. Lim., sections 166, 468; *Kane* v. *Bloodgood,* 7 Johns., Ch. 90; *Seymour* v. *Freer,* 8 Wall., 218. Such trusts are not cognizable in an action at law, but fall within the proper, peculiar, and exclusive jurisdiction of courts of chancery.   An accounting was necessary to ascertain the receipts and disbursements and liabilities of the trustees, and also to ascertain the relative priorities of the claims.

The indebtedness of $400,000 is a charge and lien upon the mine.   The title was expressly conveyed for its security. The fact that the declaration of trust provided such indebtedness, to be paid primarily out of the products of the mine, does not affect the question; for we have seen that the words "rents, issues and profits," although primarily meaning the products of the mine, yet in a broader sense include the mine itself.   Aside from this fact, the $400,000 was purchase money; was furnished by Allen, Stephens and Co. to Gisborne, to enable Gisborne to make the purchase of the two-thirds of the mine in his own name.   It is not

necessary that such lien should be confined to vendors. The party furnishing the money to the purchaser is entitled to the lien in the same manner as a vendor. 2 Dev. Deeds, 1150, and a vast number of cases there cited; *Barroilhet* v. *Anspacher*, 8 Pac. Rep., 804; *Motherwell* v. *Taylor*, 10 Pac. Rep., 304; 2 Lead. Cas. Eq., (3d Amer. Ed.) 712, 713, Har. & W. notes. The expense accounts are also a lien upon the realty. These claims were necessarily incurred in endeavoring to secure the objects of the trust. They were not incurred for the trustee's gain, but in a fair effort to carry out the trust. They were just charges upon the trust property. 2 Pom. Eq. sec. 1085 *et seq.*; 2 Perry, Trusts, secs. 485, 486, 610, 618, 907; *Davis' Petitioner*, 14 Allen, 24. And this would be true, even if in the trust there were no provisions for expenses. 2 Perry, Trusts, secs. 910, 913. The respondent, by assignment, takes the place of the assignor, and, as the statute of limitations could not bar the claims in the hands of the assignor, it could not bar them in the hands of the assignee.

It is objected that the respondent was allowed to prove for whom the trustee was acting, and who furnished the money. This objection is based upon the ground that to make such proof is to add to the written contract in trust, and that the evidence is likewise immaterial. It is claimed that the written trust speaks for itself. We do not think that such evidence added any new provisions to the declaration of trusts. It simply explained what did not appear on the face of the declaration of trust, but which the language of the declaration indicated to exist. Parol evidence was admissible to show these things. *Railroad Co.* v. *Durant*, 95 U. S., 576.

It is likewise objected that respondent was allowed to introduce in evidence the written assignment by Allen, Stephens & Co. to respondent of their claims and demands. The ground of the objection was that Allen, Stephens & Co. had no power to assign the trust, or to transfer the execution of the trust, to any other party. The objection is untenable. The evidence does not show any assignment of the trust, or of the execution of it. Allen, Stephens & Co. owned some of the claims and demands, and these they

had a right to assign, and did assign. The assignment of these claims and demands was not an assignment of the trust. There was no assignment of the trust.

It is said that Gisborne made some advances towards working the mine, and, as this action was in part for an accounting, that these advances should have been allowed. These claims of Gisborne were not set up in his pleadings, but, on the contrary, he contended against the validity of any leins or charges against the trusts, property or mine. The accounting called for was that of the trustee. If Gisborne paid any accounts for expenses, he should have presented them to the trustee. The trustee was the only proper party to keep the account of the expenses.

The refusal of the district court to grant a continuance on the application of Gisborne is assigned for error. The refusing or granting a continuance is a matter very much in the sound discretion of the court. Unless we can see that that discretion was abused, we cannot be justified in reversing the case on the ground of such refusal. In the present instance, the deposition of Stephens was taken, and, having been returned to the court, was published on the twentieth of November, 1885. The appellant did not call at the clerk's office to see it, or to see if it had been returned, until the first of May, 1886. It was then not in the office, and, supposing it to be in the hands of counsel for the respondent, appellant waited until the tenth of May, when it was obtained from such counsel. Upon examination of the deposition, it became evident to the appellant that he would need the deposition of Warren Hussey, and it would take about three weeks to get it. The trial was set for the twelfth of May, 1886. Had he procured an examination of the Stephens deposition when he first went after it, he would not, according to his own showing, have had time in which to take Hussey's deposition before the trial. We do not think that the appellant showed diligence, and the district court did not err in refusing to grant a continuance.

We do not think that there was any error in the failure of the decree to state that Gisborne was entitled to redeem.

That is a matter which is regulated by the statute, and it is not necessary that it should be stated in the decree.

Finding no error in the record, the judgment of the lower court is affirmed.

ZANE, C. J., and HENDERSON, J., concurred.