## GISBORN *v.* CHARTER OAK LIFE INSURANCE COMPANY.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF UTAH.

No. 115.　Submitted December 2, 1891. — Decided January 4, 1892.

G. conveyed to S. a "mining claim and lode" in Utah, and S. executed a declaration of trust that the conveyance had been made to him "upon trust to receive the issues, rents and profits of the said premises, and to apply the same as received": (1) to the payment of operating expenses; (2) to the repayment to S. of $400,000 advanced by him, as trustee, to G. for the purchase of the interest of his co-tenants; together with (3) other trusts. After taking out about $20,000, the vein was lost, and fruitless attempts were made to recover it, which resulted in an indebtedness of about $52,000. The holder of these claims filed a bill against S., G. and others to charge the mining property itself with their payment, and to have it sold to satisfy them, no personal decree being asked against any defendant. *Held,*

(1) That as a result of these transactions, a debt was created and the mining property itself was pledged for the payment of that debt, and of the reasonable expenses incurred in the operation of the mine, and not simply its rents and profits;

(2) That the instruments did not create a mortgage, but an active and express trust, which was not subject to the rule that when an action on the debt is barred, action on the mortgage given to secure it is also barred.

Where the manifest purpose of a transaction is security for a debt created, and title is conveyed, the mere direction to appropriate the rents and profits to its payment will not relieve the realty from the burden of the lien or limit the latter solely to the rents and profits: the test is, the manifest purpose.

In California, (from which the Territory of Utah took its statute of limitations,) the statute does not begin to run, in the case of an express trust, until the trustee, with the knowledge of the *cestui que trust,* has disavowed and repudiated the trust.

THE court stated the case as follows:

On and prior to February 24, 1874, Obadiah Embody, Warren D. Heaton, William E. Miller and Matthew T. Gisborn were the owners of the Mono Mine, situated in Ophir Mining District, Tooele County, in Utah Territory, Gisborn owning an undivided one-third, and the others the remaining undi-

vided two-thirds. · On that day, Embody, Heaton and Miller executed a deed of their undivided two-thirds to Gisborn. The consideration named and to be paid was $400,000. With the deed in his possession, he went to the. city of New York to raise the money. Negotiations were there had with the firm of Allen, Stephens & Co., through William A. Stephens, a partner, and by them on April 30, $100,000 was advanced, for which Gisborn and Warren Hussey, who was assisting in the negotiations, executed four notes of $25,000 each to William A. Stephens, trustee, and as security Gisborn made a deed of the undivided $\frac{10}{18}$ of the Mono mining property, also to William A. Stephens, trustee. Subsequently the negotiations were completed, the balance of the money advanced, and on May 6, 1874, Gisborn made a second deed conveying the remaining undivided $\frac{8}{18}$ of the property to William A. Stephens, trustee. Each of these was a warranty deed.

On May 30, 1874, Stephens executed the following declaration of trust:

"Know all men by these presents, that whereas Matthew T. Gisborn, of the city of Salt Lake and Territory of Utah, has by two certain deeds of conveyance, bearing date, respectively, April 30, 1874, and May 6, 1874, conveyed to me, William A. Stephens, of the city and county of New York, trustee, all of the 'Mono' mining claim and lode, with the tenements, hereditaments and appurtenances thereunto appertaining, situate in Dry Canyon, Ophir Mining District, Tooele County and Territory aforesaid, and more particularly described in the survey and application for a patent therefor, now pending in the United States Land Office:

"Now, as a part of the same transaction, I, the said William A. Stephens, trustee as aforesaid, do declare that such conveyance was made and received upon the trusts, nevertheless, and to and for the uses, interests, securities and purposes hereinafter limited; specified, described and declared, that is to say, upon trust to receive the issues, rents and profits of the said premises, and to apply the same as received as follows, viz.,

"First. To the payment of all expenses of operating said

mine, keeping the same with the appurtenances in good condition and repair, transportation of ores, etc., from and after the 30th day of April, 1874, including expenses for the hoisting works on said premises, and current public taxes.

"Second. To the payment to me, as trustee, of the sum of four hundred thousand dollars ($400,000) advanced by me, as trustee, to said Gisborn, for the purchase of two-thirds, undivided, of said premises from his late cotenants, together with interest at the rate of seven (7) per cent per annum, as follows: On $100,000 thereof, from and after the said 30th day of April, 1874, and on the remaining $300,000 from and after the 30th [6th] day of May, 1874.

"Third. To the payment to said Matthew T. Gisborn, of a sum equal to seven per cent per annum, upon one-third of the net proceeds of said mine, so applied to the payment of said sum of $400,000, and interest, as aforesaid, from and after the same shall be so applied, or a like percentage per annum on such portion of one-third of the net proceeds of said property as said Gisborn shall not have received in the meantime with my consent.

"Fourth. And finally to deliver and pay over to said Gisborn, his heirs or assigns, the sum of two hundred and seventy-five thousand (275,000) dollars, less the amount of net proceeds he may have received as last aforesaid, but exclusive of the interest mentioned last above in subdivision third.

"And I, the said William A. Stephens, trustee, as aforesaid, do covenant and agree to and with the said Matthew T. Gisborn, his heirs and assigns, that I shall and will duly apply all the rents, issues and profits of said property to the uses aforesaid, in the order aforesaid, and as soon as the same shall be received by me, and further, that as soon as said uses shall be fulfilled and discharged, I will cause said conveyance of said premises to me to be cancelled of record, by doing such acts and executing such instrument as may be necessary to recover or revert the title of said premises, with the tenements, hereditaments and appurtenances thereto appertaining to and in the said Matthew T. Gisborn, his heirs and assigns, to the same extent and estate as now held by me, as aforesaid, as trustee.

" And it is further declared as one of the terms of said trust, that during the continuance thereof the said premises and property, and all the operations and business pertaining thereto, shall be placed in the management and control of two persons, one of whom to be selected by the said Matthew T. Gisborn, and the other by myself, and in case of any disagreement between them in respect to the operation of said mine, and the management of the business pertaining thereto, the two agents so selected shall each select one person, and the matter of difference shall be submitted for decision to the persons so selected as last aforesaid, and in the event that the two alternates so selected, as last aforesaid, cannot agree upon a decision of the matter so referred to them, they shall select a third party as an umpire, whose decision shall determine the matter in dispute ; the compensation of such agents, and their respective alternates, shall be paid by the party on whose behalf they are selected respectively, and that of the umpire, if incurred, shall be paid as a current expense of said mine, and it is understood and approved, that said Matthew T. Gisborn, both select and appoint Alexander W. Adams as such managing agent on his behalf, and that I select and appoint Samuel K. Holman as such managing agent on my behalf, and that any vacancy which may occur in either appointment, shall be filled by the same right of selection on either side, but in no case shall any person, directly or indirectly or contingently interested in said property, be selected for this purpose, but nevertheless, it is provided and specified, as a further term of said trust, that in the meantime, on request of said Matthew T. Gisborn, his assigns or legal representatives, I shall and will reconvey to such person or persons as he may designate that portion of said mining claim and premises which is situate east of the centre of the ravine crossing said premises, nearest the eastern boundary thereof, which said ravine is further designated and identified as one in which a living spring rises, a short distance above the north boundary of said premises, the more exact metes, bounds and extent of such portion to be hereafter described by exact measurement, according to said tokens.

"In testimony whereof, I hereunto set my hand and affix my seal this 30th day of May, 1874.

"[SEAL.] W. A. STEPHENS, Trustee.

"J. B. Rosborough.

"John T. Caine."

. The two deeds to Stephens were recorded May 12, 1874, and this declaration of trust June 12, 1874.

The trustee entered upon his duties and mined some $20,000, when the vein which had theretofore produced abundantly suddenly ran out. Thereafter, in fruitless endeavors to find the lost vein, about $52,000 of indebtedness was created. By assignment the present appellee became the owner and holder of the claims for the original advances and the moneys thus fruitlessly expended, and on August 20, 1883, filed its bill in the District Court of the Third Judicial District of the Territory of Utah, the object of which was to charge the mining property itself with both these sums and to have it sold to satisfy such liability. No personal judgment was asked against any party. Stephens, the trustee, Gisborn, the firm of Allen, Stephens & Co., and Hoyt Sherman, the assignee in bankruptcy of Allen, one of the firm, and Warren Hussey were made parties defendant to the bill. On May 20, 1886, a decree was entered in favor of the plaintiff for both sums, and directing that the property be sold to satisfy such amount. Gisborn appealed to the Supreme Court of the Territory, which affirmed the decree, and thereafter he appealed to this court.

*Mr. Arthur Brown* and *Mr. Lyttleton Price* for appellant.

I. In California, from which State Utah takes its entire jurisprudence, and from which it has copied literally its statute of limitations, it is expressly provided by statute, and held by the courts, that a mortgage is barred in four years under the provisions of that statute. Under this enactment the courts have held, without dissent, that mortgages and other instruments creating liens by way of contracts are barred in four years. They are "instruments of writing," and the statute is

applicable to them. Deering's Code of Civil Procedure, section 337 and note, and discussion in the note; *McCarthy* v. *White*, 21 California, 495; *S. C.* 82 Am. Dec. 754; *Lord* v. *Morris*, 18 California, 482. In *McCarthy* v. *White*, the court say: "Where an action upon a promissory note secured by a mortgage of the same date upon real property is barred by way of the statute of limitations, the remedy upon the mortgage is barred." See also *Read* v. *Edwards*, 2 Nevada, 262; *Henry* v. *Mining Co.*, 1 Nevada, 619; *Mackie* v. *Lansing*, 2 Nevada, 302; *Cooks* v. *Culbertson*, 9 Nevada, 199; *Hayward* v. *Gunn*, 82 Illinois, 385, 389; *Kane* v. *Bloodgood*, 7 Johns. Ch. 90; *S. C.* 11 Am. Dec. 417; *Governor* v. *Woodworth*, 63 Illinois, 254.

II. A lien upon real estate must either be created by law, that is, by some statute, or by the contract of the parties. The contract of these parties did not make the $400,000 a lien upon anything but "*the rents, issues and profits*," and the expenses incurred in hunting for the lost vein were not thought of or dreamed of by the parties, and are in no way included within the contract. *New* v. *Nicoll*, 73 N. Y. 127, 130; *Perkins* v. *Perkins*, 16 Michigan, 162; *Bennett* v. *Nichols*, 12 Michigan, 22.

*Mr. Alvan P. Hyde* for appellee.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

There are three principal questions in this case: First, was the mine chargeable with the payment of the consideration money? Second, was it also chargeable with the payment of the moneys expended in the fruitless search for the lost vein? And, third, is the cause of action barred under the statute of limitations?

With respect to the first, the contention of appellant is that Stephens, as trustee, was a purchaser of the undivided two-thirds acquired by Gisborn by his deed of 24th February, 1874; that, as such purchaser, he took all the chances of the mine's productiveness; and that now, on its failure, he must

pocket the loss. And, secondly, that the trust was only in reference to the rents, issues and profits; that Stephens, having taken title for the purpose of executing such trust, has failed, and relinquished all attempts at so doing; and, therefore, that the title to the one-third of the mine, of which Gisborn was all the while the owner in equity, has now reverted, and a decree should have been entered directing a conveyance thereof by Stephens to him.

These matters must be settled not by parol testimony as to the prior conversations and negotiations between the parties, but by the terms of the written instruments, which express the result of all such negotiations, and constitute the contract between the parties. If the meaning of these instruments be in any respect doubtful, reference may be had to the surrounding circumstances for the purpose of interpretation; but, when interpreted, the writings which constitute the contract determine the relative rights. Fortunately the language is not obscure, and the real transaction is fully disclosed. There was no purchase by Stephens, or the firm for which he was trustee. On that side of the transaction there was only a loan of money. By the deed of February 24, 1874, from his co-owners, Gisborn became the owner of the entire mine. True, the delivery at first may have been conditional, and to be completed only on the payment of the consideration; but, when that was paid, as it was, then the delivery was complete, and Gisborn became the absolute and full owner. Gisborn, as owner, by two deeds conveyed the entire mine to Stephens as trustee, and not individually. The terms of that trust were disclosed by the declaration of May 30, which, as stated in it, was "a part of the same transaction." The two deeds and the declaration may, therefore, be considered as one instrument making a conveyance of lands upon certain specified trusts and conditions. They are that the grantee shall take the title and possession; out of the rents, issues and profits pay certain moneys; and then reconvey the entire property to the grantor. If the firm had been a purchaser, then, on performance of the trust, the trustee should have conveyed to it the portion of which it was a purchaser. As was well said

by the Supreme Court of the Territory, "The idea of a sale and that the purchaser was not to get the title are not consistent." ᴗ

Nor is this conclusion affected by the surrounding circumstances, or the subsequent conveyances disclosed by the testimony. It appears that Warren Hussey, who had no interest in the property, was helping Gisborn to negotiate the loan, on a promise of receiving, if successful, an interest in the mine. In order to induce Allen, Stephens & Co. to make the loan, he promised to share with them his compensation; and on April 13, and prior to any advances, this agreement was executed:

"NEW YORK, April 13, 1874.

"It is understood that Warren Hussey gets four-eighteenths of all the 'Mono' mine in his own right. With us he agrees to make the matter satisfactory to us from the said four-eighteenths, even if he gives us all of it.

"ALLEN, STEPHENS & CO.,
"WARREN HUSSEY."

After the declaration of trust, but on the same day, Gisborn gave to Hussey a contract, which recited that "for and in consideration of certain moneys advanced and services rendered to me in effecting the purchase of two-thirds of the 'Mono' mining claim and lode from my late cotenants, . . . as soon as the uses and purposes of said trust shall be fulfilled and accomplished according to the terms of said declaration of trust, (reference thereto here made for particulars,) I shall and will convey to the said Warren Hussey, his heirs and assigns, by good and sufficient deed, the following described part, portion and interest in said mining claim, lode and premises, viz., the one-half, undivided, of all that portion of said 'Mono' mining claim, lode and premises," etc. And on August 10, 1874, Hussey executed to William A. Stephens a bond to convey to him all the interest acquired under such contract from Gisborn.

But the transaction evidenced by these instruments was independent of the loan. It was an arrangement of the agent

with respect to his compensation for services, and does not change the contract made by the two deeds and the declaration. Indeed, the recital in the bond from Gisborn is equivalent to an assertion by him, that he, rather than Allen, Stephens & Co., was the purchaser of the two-thirds, and is inconsistent with his present claim in respect thereto. No disposition which Hussey, his agent, might make of the interest which he proposed to convey to him for his services in effecting a purchase from the cotenants, would reach backward and modify the terms of the contract between him and the lenders to him, or alter their established relations.

Further, these contracts throw light upon the third and fourth clauses of the declaration, which otherwise would appear strange and unnecessary provisions. Were it not for them, it might seem singular that if the trust was simply to pay the $400,000 borrowed from Allen, Stephens & Co., the reconveyance should not be made immediately upon such payment, and that the trust should continue further, and until the payment of $275,000 to Gisborn. They show that the final arrangement was not that Gisborn should give Hussey an undivided one-half of the mine after the payment out of the profits of the money borrowed, but only after the payment of the loan, and also the receipt by himself of the further sum named. In other words, the transaction practically amounted to this: The mine was placed as security to Allen, Stephens & Co. for the $400,000 borrowed, then to Gisborn for $275,000, and, thereafter, Hussey was to receive one-half for his services. But whatever arrangements may have been made between Gisborn and Hussey, and whatever disposition Hussey may have seen fit to make of the remote interest he was to acquire from Gisborn, the transaction between Gisborn and Allen, Stephens & Co. was fully contained in and determined by the two deeds and the declaration. That transaction was a loan by Allen, Stephens & Co. of $400,000, on the security of the mine.

Neither is there force in the contention that the mine itself was not the security, but only the rents, issues and profits. It is true that the language of the trust is " to receive the issues,

rents and profits of the said premises, and to apply the same as received as follows." Undoubtedly the thought of the parties was that the mine would continue so productive that the issues and profits would pay these amounts, but the mine itself was conveyed, and the further stipulation was that upon the discharge of this trust the mine should be reconveyed. The trust contemplated the payment of the sums named, and until they were paid the trust was not discharged. The language used may not have been the most apt, but the intent is clear. What was meant is, that the mine was not placed in the hands of the trustee simply for the purposes of sale, but in order that he might work it and apply the proceeds to the payment of these sums. There was not a mere conveyance of the title in the nature of a mortgage to secure the debt, but an express and active trust.

Undoubtedly the owner of real estate can specifically appropriate rents and profits to a named purpose, or create a trust in them separate and apart from the title to the real estate; but where the manifest object is security, and the title is conveyed, the mere direction to appropriate the rents and profits to the payment of the debt will not relieve the realty from the burden of the lien or limit the latter solely to the rents and profits. The test is — the manifest purpose. Is that merely to dispose of the rents and profits or is it to grant security for an indebtedness? This question is not a new one. It has arisen frequently in the consideration of powers given by will to dispose of rents and profits. In the case of *Allan* v. *Backhouse*, 2 Ves. & Beam. 65, the Vice Chancellor held that where the term was created for the purpose of raising money out of the rents and profits, if the trust of a will required that a gross sum should be raised, the expression "rents and profits" would not confine the term to the mere annual rents, but would authorize the sale or mortgage of the estate itself. In 2 Story's Equity Jurisprudence, (11 ed.,) sec. 1064a, the rule is thus stated: "When a testator directs a gross sum to be raised out of the rents and profits of an estate at a fixed time, or for a definite purpose or object, which must be accomplished within a short period of time, or

which cannot be delayed beyond a reasonable time, it is but fair to presume that he intends that the gross sum shall at all events be raised, so that the end may be punctually accomplished; and that he acts under the impression that it may be so obtained by a due application of the rents and profits within the intermediate period. But the rents and profits are but the means; and the question therefore, may properly be put, whether the means, if totally inadequate to accomplish the end, are to control the end or are to yield to it. Now if the gross sum cannot be raised out of the rents and profits at all, or not so soon as to meet the exigency contemplated by the testator, it would seem but a reasonable interpretation of his intention, to presume that he meant to dispense with the means, and, at all events, to require the sum to be raised." See also Hawkins on Wills, 120; 1 Powell on Mortgages, 61. The same ruling has been applied to mortgages. In 3 Pomeroy's Equity Jurisprudence, § 1237, the author says that "an assignment of the rents and profits of land as security for a debt is another mode of creating an equitable lien on the land in the favor of the assignee." And in *Ex parte Willis*, 1 Ves. Jr. 162, it is said of such an assignment that "it is an odd way of conveying; but it amounts to an equitable lien, and would entitle the assignee to come into equity and insist upon a mortgage." *Legard* v. *Hodges*, 1 Ves. Jr. 477; *Smith* v. *Patton*, 12 West Va. 551.

The evident purpose of these instruments was not the mere appropriation of the rents and profits; the parties contemplated security for the debt. The owner conveyed the title to the trustee; and the provision as to rents and profits, while imposing a primary duty on the trustee, does not, if the rents and profits fail to accomplish the object of the conveyance, to wit, the payment of the debt, prevent the application of the realty itself thereto.

Passing now to the second question: The trust, as disclosed by the first clause, contemplated the continued operation of the mine, keeping it and its appurtenances in good repair, and the payment of taxes. Whatever expenses were legitimately incurred in the discharge of this part of the trust were charge-

able upon the property. These were not debts created on the personal obligation of the trustee, and afterwards sought to be thrown upon the estate, but in an honest and reasonable execution of the trust. In 2 Pomeroy's Equity Jurisprudence, sec. 1085, it is said that "the trustee is entitled to be allowed, as against the estate and the beneficiary, for all his proper expenses out of pocket, which include all payments expressly authorized by the instrument of trust, all reasonable expenses in carrying out the directions of the trust, and, in the absence of any such directions all expenses, reasonably necessary for the security, protection and preservation of the trust property, or for the prevention of a failure of the trust." Gisborn is certainly not in a position to complain of these expenditures, for most of them, at least, were incurred while he was acting as manager for the trustee, and were approved by him in writing. It will not do to say that it was the duty of the trustee to stop work the moment the vein was lost. It was a reasonable exercise of the power vested in him to make some limited exploration to see if the lost vein could not be recovered. No one could tell in advance how great had been the displacement; perhaps a few feet of mining might have brought it to light; and as Gisborn was consulted on these efforts, and approved of them, and the expenditures were largely made under his direction, it must be adjudged, as against him, that they were reasonable, and therefore also chargeable upon the trust estate.

With reference to the last question, the contention of the appellant is, that if the title was conveyed as security, then the instruments created simply a mortgage; and that the rule in California, from which State Utah took its statutes, is that when action on the debt is barred, action on the mortgage given to secure the debt is also barred. *Lord* v. *Morris*, 18 California, 482; *McCarthy* v. *White*, 21 California, 495.

The obvious answer is that these instruments did not create a mortgage, but an active and express trust, and the rule invoked as to mortgages does not apply, either in California or elsewhere. In *Miles* v. *Thorne*, 38 California, 335, it was held that the statute of limitations does not begin to run in

the case of an express trust, until the trustee, with the knowledge of the *cestui que trust*, has disavowed and repudiated the trust. In *Hearst* v. *Pujol*, 44 California, 230, the proposition is laid down that "if A. conveys to B. a tract of land, to be by B. afterwards reconveyed to himself, he thereby creates an express trust, which B. may accept by accepting the deed;" and also that, "the statute of limitations does not commence running on A.'s right to a reconveyance until B. repudiates the trust, and such repudiation is brought to the knowledge of A." And *Grant* v. *Burr*, 54 California, 298, draws the distinction between a deed of trust and a mortgage, as to the running of the statute of limitations. In that case, the trustee under a deed of trust, long after the notes secured thereby had become barred by the statute of limitations, was proceeding to sell the land under the power conferred. The grantor in the deed sought to enjoin such sale, but the injunction was denied, and this ruling was affirmed by the Supreme Court. See also *Henry* v. *Mining Company*, 1 Nevada, 619; *Bacon* v. *Rives*, 106 U. S. 99; *Seymour* v. *Freer*, 8 Wall. 202, in which the general proposition is laid down that the statute of limitations has no application to an express trust where there is no disclaimer. In the case at bar there was no disclaimer on the part of the trustee, no repudiation of the trust. He never asserted title in himself as against any beneficiary. On the contrary, he continued to work the mine, and in the active discharge of the trust, so long as money therefor was available, and then, with the consent and approval of Gisborn, leased the mining property for two successive years, and until January, 1880, to parties who stipulated to do certain work therein. That nothing was done by him after this was not because of any repudiation of the trust, but simply from a lack of means. His inaction under the circumstances amounts to nothing further than this, that the continued failure to realize rents, issues and profits justified an appeal to the courts to subject the realty itself to the satisfaction of the claims.

These are the principal and decisive questions in the case, and in respect to them, or otherwise, we see no error in the rulings. The decree will, therefore, be

*Affirmed.*