CONNOLLY v. BOUCK et al.†

(Circuit Court of Appeals, Eighth Circuit. November 18, 1909.)

No. 3,034.

1. CONTRACTS (§ 95*)—VALIDITY OF ASSENT—DURESS.

Threats made by one member of a mining partnership to another that, unless the latter signed a contract presented to him, the former would advance no more money to develop the mine, which should be shut down and rendered worthless, did not constitute duress which would invalidate the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 431–440; Dec. Dig. § 95.*]

2. CONTRACTS (§ 97*)—VALIDITY OF ASSENT—CONTRACT MADE UNDER DURESS—RATIFICATION.

A contract made under duress is not void, but voidable only, and cannot be avoided by a party who, after its execution, has ratified it by accepting its benefits.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 442–446; Dec. Dig. § 97.*]

3. LIENS (§ 7*)—CREATION BY CONTRACT—IMPLIED LIEN.

Complainants and defendant, who were jointly interested in mining property for the development of which complainants had made large advances, entered into a contract giving complainants the right to manage the property and apply the profits, and, in case of a sale, the proceeds of the property, to the repayment of such advances. *Held*, that such contract gave them an equitable lien on the property itself, which they were entitled to foreclose when it had been demonstrated that the operation of the mines was unprofitable.

[Ed. Note.—For other cases, see Liens, Cent. Dig. §§ 26–28; Dec. Dig. § 7.*]

Appeal from the Circuit Court of the United States for the District of Colorado.

Suit in equity by Francis E. Bouck, administrator with the will annexed of Mary Connolly Andrews, and Michael Connolly, against Patrick K. Connolly. Decree for complainants, and defendant appeals. Affirmed.

Hugh Butler, for appellant.
Harvey Riddell, for appellees.

Before SANBORN and VAN DEVANTER, Circuit Judges, and WM. H. MUNGER, District Judge.

WM. H. MUNGER, District Judge. One Patrick K. Connolly was possessed of certain mining claims in the state of Colorado. Having little means, he entered into an arrangement with his brother, Nicholas K. Connolly, in June, 1894, whereby Nicholas K. Connolly was to advance certain moneys for the development of the properties, and said properties should be owned equally, share and share alike, by Patrick K. Connolly and Nicholas K. Connolly. In pursuance of this agreement Nicholas K. Connolly furnished some moneys which Patrick K. Connolly used in developing the mines. In the fall of 1894 Michael Connolly, another brother, visited defendant in Colorado, and it was

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied March 4, 1910.

then agreed that Michael Connolly should also advance moneys for the development of the claims, and that the claims should be owned, one-third by Patrick K. Connolly, one-third by Nicholas K. Connolly, and one-third by Michael Connolly. This arrangement was assented to by Nicholas K. Connolly. There after Nicholas K. Connolly and Michael Connolly advanced moneys for the development of said properties until August, 1900, they had advanced the sum of $114,513.43. Patrick K. Connolly, however, used some $7,000 of this money in the purchase of some stock in another mine. In August, 1900, Michael Connolly and Patrick K. Connolly, being together in Leadville, Colo., Michael Connolly representing himself and Nicholas K. Connolly, the following written agreement was executed:

"This agreement, made this 13th day of August, A. D. 1900, by and between Michael Connolly, of the city of Montreal, Canada, and Nicholas K. Connolly, of the town of Boonton, in the state of New Jersey, parties of the first part, and Patrick K. Connolly, of the city of Leadville, county of Lake, and state of Colorado, witnesseth as follows, to wit: That the management of the Dolly B mine and all other properties—mining properties—situate in the county of Lake and state of Colorado, and standing on the record in the name of either of the parties aforesaid, or in the name of either member of the said party of the first part, shall be taken and controlled by the said party of the first part until said party shall have realized the amount said party has contributed and furnished for the development or obtaining title thereto or expense in maintaining such title, either in litigation or otherwise, above and in excess of the proportionate share thereof; that the stock of the Big Six Mining Company, now in the bank to the credit of the said party of the second part, shall be delivered to the said party of the first part, to be managed as the other property of the company is managed; that either of the said parties may at any time obtain a purchaser for any or all of the said property at the best price possible to obtain therefor, which proposition shall be submitted to the other party, who shall have a reasonable time, under the circumstances, to obtain a better price, and, in case no better price can be obtained in such reasonable time, the said party of the second part shall have the preference and be entitled to buy at such price; and that when all of the advances of the said party of the first part as aforesaid shall have been repaid, either from the produce of the said property or from the sales made as aforesaid, as well as fifteen thousand dollars ($15,000) advanced to the said party of the second part in the year 1875, by the said party of the first part, together with legal interest on both sums, then the said party of the second part shall have the equal undivided one-third of whatever remains, which shall be legally conveyed or assigned to him by the said party of the first part. That the said party of the first part shall, within a reasonable time hereafter, exhibit the books of said party with regard to the said $15,000 to the said party of the second part, or his authorized agent, and if they demonstrate that a less sum than the said $15,000 was advanced to the said party of the second part, the said sum of $15,000 shall be reduced by the difference between the two sums.

"In witness whereof, the said parties have hereunto set their hands and seals in duplicate the day and year first above written."

Nicholas K. Connolly died in February, 1901, leaving as his only heir Mary Connolly Andrews. After the death of Nicholas K. Connolly and the execution of the agreement of August, 1900, Michael Connolly advanced the further sum of $21,916.18, and Mrs. Andrews advanced $23,975.25, which was used in developing the mines. No profitable results were obtained by the development. While some $200,000 was received from ore taken from the mines, that amount was also expended, in addition to the advances before mentioned, in developing the mines. On account of a disagreement between the

parties, and the unprofitable operations, further developments ceased, and in August, 1904, Michael Connolly and Mary Connolly Andrews filed their bill in the Circuit Court for the state and district of Colorado, setting forth said agreement, the advances of money, and other matters unnecessary to be considered, praying that an accounting might be had of the moneys advanced by said Nicholas K. Connolly and Michael Connolly and Mary Connolly Andrews, that the amounts advanced be decreed to be a lien upon said mining properties, and that the same be sold to satisfy said lien. During the progress of the suit Mary Connolly Andrews died, and the action was revived as to her interest in the name of Francis E. Bouck, administrator of her estate.

The defendant, Patrick K. Connolly, in his answer, alleged, among other things, that in June, 1894, he entered into an arrangement with his brother, Nicholas K. Connolly, to furnish him financial aid and assistance in the acquisition and operation of such mining properties, whereby it was agreed that all the properties which Patrick K. Connolly had then located and of which he was the owner, and all properties to which he might thereafter acquire title, should be developed, with the object and intention of uncovering any ore bodies that might be found within said locations, and place the same upon a paying basis, if such were possible, and as a part of such arrangement it was agreed that said properties should be owned equally, share and share alike, by Patrick K. Connolly and Nicholas K. Connolly; that in the fall or winter of 1894 Michael Connolly proposed that he be admitted into the enterprise, offering to contribute one-half of the expenses and to furnish one-half of the sums that might be required from time to time to carry on the enterprise, and that the interests in the property should be changed so that he (Michael Connolly) should receive one-third interest therein, Nicholas K. one-third, and Patrick K. one-third; and that Patrick K. should continue to devote his time and energies and experience in the management and workings of the properties and the proper expenditures of the moneys to bring about the results hoped for. Michael Connolly was admitted into the enterprise in pursuance of such agreement, and thereafter Michael and Nicholas K. Connolly advanced large sums of money. Defendant, however, alleged that the agreement of August, 1900, was obtained from him by Michael Connolly by duress; that Michael Connolly threatened that, unless he executed the contract, neither he (Michael) nor Nicholas K. would advance any farther moneys for the purposes aforesaid, and that Patrick K. would thus lose all his interest in the property. He farther says in his answer that he—

"had been at all times, and was now, willing and anxious to pursue his course and discharge his part of the agreement."

Upon issues being joined, evidence was taken, and a decree entered for plaintiffs as prayed for, from which Patrick K. Connolly has appealed.

While the evidence is conflicting as to just what took place or was said between Michael Connolly and Patrick K. Connolly at the time the written agreement of August, 1900, was executed, we do not think that the facts in that respect, as testified to by Patrick K. Connolly,

constitute duress. Patrick K. Connolly testified that Michael had the agreement drawn in the office of an attorney before presenting it to him. He then testified:

"Well, I objected to signing it and told Mr. Michael Connolly that it looked to me like a —— outrage—was the language I used. Michael Connolly came after me, and he says to me, 'If you don't sign that agreement, you lose every —— —— thing you have got in this property,' and I says, 'How am I going to lose it?' And he says, 'I will see that the property is shut down before I leave here, and you will be drowned out, and I will never put another dollar into the enterprise, and I will see that Nick don't either.' I became satisfied in my mind that Nick would straighten this matter out as soon as he heard of it."

The agreement was then signed. This version of the transaction, as stated by defendant himself, falls short of establishing the execution of the agreement under duress. French v. Shoemaker, 14 Wall. 314, 20 L. Ed. 852; McClair v. Wilson, 18 Colo. 82, 31 Pac. 502; Silliman v. U. S., 101 U. S. 465, 25 L. Ed. 987; Wilson S. M. Co. v. Curry, 126 Ind. 161, 25 N. E. 896; Whittaker v. Southwest Virginia Improvement Co., 34 W. Va. 217, 12 S. E. 507; Clarke on Contracts, § 172; Bishop on Contracts, c. 25.

If, however, it be admitted that Patrick K. Connolly executed the agreement under duress, such defense would not now be availing to him. The agreement would not be void upon that account, but voidable on the part of Patrick K. Connolly. Instead of taking steps to avoid it, he accepted the advances of money thereafter made for the development of the mine, and alleges, in his answer, that he had been at all times since, and even now, willing and anxious to pursue his course and discharge his part of the contract; so he will not now be heard to say that the agreement is not of binding force because executed under duress.

It is also contended on the part of appellant that, as the agreement itself did not in terms give a lien upon the properties for the moneys advanced, but provided that from the proceeds of the mines derived from their operation, or, in case of private sale, from the proceeds of such sale, the parties were to be reimbursed for their advancements, such fact precludes the idea that there could be a lien upon the property for such advancements which could be enforced by a court of equity. We think, under the facts, that the arrangement and agreement between the parties constituted what is known as a "mining partnership," and in Duryea v. Burt, 28 Cal. 569–579, in which the rights of parties under a mining contract were considered, it was said:

"It may be laid down as a general principle that each member of a partnership has a specific lien on the partnership property, not only for the debts and liabilities due to third persons, but also for his own share of the capital stock and funds, and for all moneys advanced by him for the use of the concern."

In Ex parte Wills, 2 Cox, 233, it was held that the pledge of the rents and income of real estate to secure an indebtedness constituted the giving of an equitable lien upon such real estate. The same was also held in Legard v. Hodges, 1 Ves. Jr. 477.

In Charter Oak Life Ins. Co. v. Gisborne, 5 Utah, 319, 15 Pac. 253, certain mining property was conveyed to a trustee. The court said:

"'Such conveyance was made and received upon the trusts, nevertheless, and to and for the uses, interests, securities, and purposes hereinafter limited, specified, described, and declared; that is to say, upon trust to receive the rents, issues, and profits of said premises, and to apply the same as received as follows, viz.,' etc. Then followed in the declaration of trust the requirement to pay, first, the expenses of operating the mine, etc.; second, to pay the $400,-000 back to Stephens, trustee; third, to pay Gisborne a percentage of one-third of the net proceeds of the mine; and, fourth, to pay Gisborne $275,000. The appellant urged that the foregoing provisions for the trustee to receive the rents, issues, and profits of the mine require these various amounts to be paid out of the product of the ores of the mine, and are a prohibition against the taking of the mine itself to pay them. * * * Primarily, no doubt, the indebtedness was to have been paid out of the ores taken from the mine; but when the mine ceased to be productive this mode of paying the indebtedness failed. If the creditors could resort only to the 'rents, issues, and profits,' and this meant only the ores, and they had ceased, the creditors had exhausted all their security. The meaning of the words 'rents, issues, and profits' has often been before the courts, and by a long line of decisions the courts of chancery have declared that, unless these words be connected with other words which restrain the meaning of the terms to the rents, issues, and profits as they arise (as if the trust is to pay debts out of the annual rents), the courts will give the words a meaning broad enough to include the sale of the property itself. The strict meaning of the words, as opposed to land, is the annual rents, issues, and profits. Yet the courts hold that they should not be confined thereto, but should be taken, in a more enlarged sense, to include every mode by which land may be made to yield profits, out of which money so charged upon it may be taken, and, consequently, to include the sale of the property itself. The doctrine is thus laid down broadly by Judge Story in his work on Equity Jurisprudence. It is likewise laid down in Perry on Trusts, in Hawkins on Wills, in Powell on Mortgages, and in other works, citing an array of authorities. 2 Story, Eq. Jur. § 1064, 1064a; 1 Pow. Mortg. 60–80; Hawk. Wills, 120 et seq.; New v. Nicoll, 73 N. Y. 130, 131, 29 Am. Rep. 111; 2 Perry, Trusts, pp. 168, 170, § 602g, 602k; Fletch. Trustees, 56 et seq."

This case was affirmed by the Supreme Court in 142 U. S. 326, 12 Sup. Ct. 277, 35 L. Ed. 1029. The same rule was announced in Gest v. Packwood (C. C.) 39 Fed. 525–533.

We think these authorities applicable in this case. Not only were the proceeds of the mine pledged to the payment of the advances which had been made by complainants, but it was provided that, in case of a sale of the property, out of the proceeds of such sale, the amount of the advances which they had theretofore made should be refunded. Applying the equitable principles announced in the foregoing authorities, we think it clear that complainants have an equitable lien upon the premises in question, and that the finding of the court below in this respect was proper.

It is said that the court erred in the accounting to the extent of some $22,000. We have gone carefully over the evidence, and find no reason to disturb the finding of the court in that respect; and the decree is affirmed.