724 P.2d 125

**Marjorie Ruth MOON, as State Treasurer, Petitioner,**

v.

**The STATE BOARD OF LAND COMMISSIONERS, of the State of Idaho, Respondent.**

No. 16199.

Supreme Court of Idaho.

June 2, 1986.

John S. Chapman, Boise, for petitioner.

Hon. Jim Jones, Atty. Gen. (argued), and Steven L. Addington, Deputy Atty. Gen., Boise, for respondent.

SHEPARD, Justice.

This is an original proceeding in the nature of a petition for writ of mandamus or prohibition brought by the State Treasurer against the State Board of Land Commissioners asserting the unconstitutionality of I.C. § 58–140, which provides that revenues obtained from leases and timber sales on certain state lands may be used for expenses incurred in administering those lands. We hold that I.C. § 58–140 is constitutional, and hence deny the petition.

We note at the outset that I.C. § 58–140 having been duly enacted in 1969 and last amended in 1981, carries with it a presumption of constitutionality. *School*

*Dist. No. 25 v. State Tax Commission*, 101 Idaho 283, 612 P.2d 126 (1980); *Board of County Commissioners v. Idaho Health Facilities Authority*, 96 Idaho 498, 531 P.2d 588 (1975).

Section 58–140, Idaho Code, provides:

**58–140. Special account for the maintenance, management and protection of state owned timber, grazing and recreational site lands.**—A reasonable amount not to exceed ten per centum (10%) of the moneys received from the sale of standing timber, from grazing leases and from recreation site leases shall constitute a special account, which is hereby created to be used for maintenance, management and protection of state owned timber lands, grazing lands and recreation site lands; provided, that any moneys constituting part of such account received from a sale of standing timber or from leases of lands which are a part of any endowment land grant shall be used only for the maintenance, management and protection of lands of the same endowment grant. Provided further, that all such funds collected from timber sales shall be expended solely for the purpose of management, protection and reforestation of state lands. All such funds collected from recreation site leases shall be expended for the maintenance, protection and improvement of both new lease sites, and existing recreation areas situate on state lands. All such funds collected from grazing leases shall be expended for the maintenance, management and protection of state owned grazing lands. Control and eradication of noxious weeds is a part of the maintenance, protection and improvement programs.

The state board of land commissioners is hereby authorized to establish rules and regulations fixing a percentage of the amount received from each sale of standing timber and from each grazing and recreation site lease, not to exceed ten per centum (10%) of the total, which shall constitute the special account herein created. The account shall be deposited with the state treasurer, who shall keep a record thereof which shall show separately moneys received from each category of endowment lands. All moneys deposited in the account are hereby appropriated continually to the state board of land commissioners for the purposes hereinabove enumerated.

Additionally, the state board of land commissioners is hereby authorized to contract with the state department of agriculture, or with any county, to provide programs of noxious weed control or eradication on state lands, and may utilize such resources as are available to the board for such purposes.

At the time of its enactment in 1969, the stated purpose of the legislation was:

It is hereby declared to be for the best interests of the state of Idaho and for the designated beneficiaries of the several endowment land grants held in trust by the state of Idaho from the United States government, to provide for the maintenance and protection of the market value of state owned timber lands, grazing lands and recreation site lands.

Section 14 of the Organic Act of the Territory of Idaho made grants of land to the territory to be used for the maintenance of public schools. Sections 4, 5, and 7 of the Idaho Admission Bill elaborate on such school endowment lands, providing for certain sections in every township of the state to be set aside for support of the common schools with the proceeds of the sale of such sections to constitute a permanent school fund. It was also provided that the interest from said funds will only be expended for the support of the common schools.

Article 9, § 3 of our Constitution provides:

*Public School Fund to Remain Intact*— The Public School Fund of the state shall forever remain inviolate and intact; the interest thereon only shall be expended in the maintenance of the schools of the state, and shall be distributed among the several counties and school districts of the state in such manner as may be

prescribed by law. No part of this fund, principal or interest, shall ever be transferred to any other fund, or used or appropriated except as herein provided. The State Treasurer shall be custodian of this fund, and the same shall be securely and properly invested as may be by law directed. The state shall supply all losses thereof that may in any manner occur.

This Court has strictly construed ID. CONST. art. 9, § 3 to the end that the Public School Fund will not in any way be subject to depletion of principal or interest. *Moon v. Investment Board,* 98 Idaho 200, 560 P.2d 871 (1977); *Engelking v. Investment Board,* 93 Idaho 217, 458 P.2d 213 (1969); *State v. Fitzpatrick,* 5 Idaho 499, 51 P. 112 (1897). *See also United States v. Fenton,* 27 F.Supp. 816 (D.C.Idaho 1939).

ID. CONST. art. 9, § 8 provides in pertinent part:

It shall be the duty of the state board of land commissioners to provide for the location, protection, sale *or rental of all the lands heretofore, or which may hereafter be granted* to or acquired by the state by or from the general government, under such regulations as may be prescribed by law, and *in such manner as will secure the maximum long term financial return to the institution* to which granted or to the state if not specifically grant; ... The legislature shall, at the earliest practicable period, provide by law that the general grants of land made by congress to the state shall be judiciously located and carefully preserved and held in trust, subject to disposal at public auction for the use and benefit of the respective object for which said grants of land were made, and *the legislature shall provide for* the sale of said lands from time to time and for the sale of timber on all state lands and for *the faithful application of the proceeds thereof in accordance with the terms of said grants;* ... (Emphasis added.)

The parties hereto cite no authority from this or any other jurisdiction squarely on point, nor even analogous to the circumstances of this case. Petitioner Moon re-

lies principally upon *Moon v. Investment Board, supra,* but we find that case inopposite. There, the State Treasurer sought an original writ to prohibit the State Investment Board from, under the authority of a statute, using monies acquired from investments of the public school funds to defray expenses incurred by the Investment Board in the investment of the Public School Fund. There, the monies clearly constituted a part of the corpus of the Public School Fund which could not be diverted under the previous decisions of this Court. In the instant case the monies at issue are not part of the corpus of the Public School Fund but rather constitute revenues derived from the management of a different trust res which constitutes the school endowment lands pursuant to art. 9, § 8 of our Constitution, *supra.*

The State of Idaho manages two separate trusts for the benefit of public schools. The Public School Fund is the res of the first trust, which is invested by the Investment Board. I.C. § 57–715 et seq. The State's constitutional responsibilities regarding this trust and the protection of the money corpus are found in ID. CONST. art. 9, § 3. The second trust consists of school endowment lands managed by the Land Board. The endowment lands themselves form the res of this trust and the State's constitutional duties regarding this trust and protection of the land corpus is found in ID. CONST. art. 9, § 8.

As above noted, the legislation at issue here carries with it a presumption of constitutionality. In *Rich v. Williams,* 81 Idaho 311, 341 P.2d 432 (1959), this Court had before it the question of special funds or revenues constitutionally dedicated to a particular purpose and the claim that the legislature was unconstitutionally attempting to divert those funds. There the argument was made that certain funds were constitutionally required to be used exclusively for construction, repair and maintenance of the public highways. The action sought to prohibit the use of such funds for the construction of an office building as

a necessary and proper function to the administration of the highway program.

The Court in *Rich* held that the projected usage of the money was not unconstitutional, pointing out:

> "Our State Constitution is a limitation, not a grant of power, and the Legislature has plenary powers in all matters, except those prohibited by the Constitution. ...

> "A legislative act is presumed to be constitutional and all reasonable doubt as to its constitutionality must be resolved in favor of its validity. ...

> "Where a statute is opened to two constructions one of which will render it unconstitutional, and the other constitutional, the rule of construction must be adopted which will uphold it. ...

> "The burden of showing the unconstitutionality of a statute is upon the party asserting it, and invalidity must be clearly shown. ...

> "In the proper application of the foregoing rules it becomes the duty of the courts to uphold the constitutionality of legislative enactments if such can be accomplished by reasonable construction. ...

> " 'It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. The constitutional invalidity must be manifest, and if it rests upon disputed questions of fact, the invalidating facts must be proved.' "

■ In the instant case we hold that the alleged constitutional invalidity is not manifest nor clearly shown and that a reasonable construction of the interaction of our various constitutional provisions, taken together with the Organic Act and the Idaho Admission Bill, militate for the validity and constitutionality of the legislation in question here.

■ ID. CONST. art. 9, § 4 provides in pertinent part: "The public school fund of the state shall consist of the proceeds of such lands as have heretofore been granted, or may hereafter be granted, to the state by the general government, known as school lands, and those granted in lieu of such; ..." Arguably, art. 9, § 4 could be read to require that monies received from leases or timber sales of public school endowment lands are "proceeds of such lands." However, art. 9, § 4 must be read in the context of the enabling act, § 5 of the Idaho Admission Bill, which provides clearly that "proceeds" only refers to monies received from *sales* of endowment lands.

Said § 5 of the Idaho Admission Bill provides in pertinent part:

> (a) Except as provided in subsection (b) *all lands herein granted for educational purposes shall be disposed of only at public sale, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools. Such lands may, under such regulations as the legislature shall prescribe, be leased for a period of not more than ten years,* and in the case of an oil, gas, or other hydrocarbon lease or a geothermal resource and associated by-products lease, for as long thereafter as such produce is produced in paying quantities or the lessee in good faith is conducting well drilling or construction operations, and such lands shall not be subject to preemption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only. (Emphasis added.)

That language indicates that the phrase "the proceeds to constitute a permanent school fund, the interest of which only shall be expended in support of said schools" modifies only the phrase "all lands herein granted for educational purposes shall be disposed of only at public sale...." The language of § 5 authorizing the lease of lands is not followed by any requirement that the funds derived of rents constitute a permanent fund for the support of schools, but rather indicates that such lands may be leased under "such regulations as the legislature shall prescribe."

The provisions of the Organic Act of the Territory of Idaho and the Idaho Admission Bill established grants of land to be used for the financing of the public schools of Idaho. Those congressional enactments were implemented by provisions of the Idaho Constitution adopted in 1890. We deem that all of the above-mentioned provisions demonstrate a rationale to strike a balance between the current and the long-term needs of the state of Idaho. All monies derived from the sale of such lands must be deposited in the Public School Fund and thereafter remain inviolate. Only the interest received from the investment of that Public School Fund may be withdrawn, and the interest may be only used for the maintenance of the public schools.

In this day and age some would consider such a scheme to be an anachronism since it in effect holds many millions of dollars in limbo which cannot be used for any purpose except the production of revenue. However that may be, the result is clearly mandated by our Constitution. On the other hand, such a constitutional scheme can be viewed as resulting from the concern of the framers that public school education is extremely important to the state of Idaho, and the long-term future of public school education needs of the state will be assured at least in part by the revenues produced from the investment of such Public School Fund.

The framers of our Constitution may well have theorized that once public school endowment lands are sold they no longer constitute an asset of the state nor a trust res, and therefore upon *sale* of lands the proceeds of the sale must be deposited in the Public School Endowment Fund to thereafter constitute a trust res that would continue to provide income for the benefit of the public schools. On the other hand, we see no clear intent on the part of the framers of our Constitution or the federal Congress, to require that the proceeds re-

sulting from transactions not involving the *sale* of the land are required to be deposited as a trust res in the Public School Endowment Fund. Since the land continues to be owned by the state and held in trust for the use and benefit of the public schools, it continues to remain a part of the trust res and the State Land Board, as trustee, is constitutionally and statutorily required to provide for the protection of said land "under such regulations as may be prescribed by law, ..."

Hence, we hold that I.C. § 58–140, which permits a sum not to exceed ten percent of the revenue received from the sale of standing timber and from grazing and recreational leases, to be used for the maintenance, management and protection of those lands, is in accord with the principles of basic trust law, *i.e.*, a trustee may deduct expenses from the res of the trust in order to preserve and protect the trust property. *See Gisborn v. The Charter Oak Life Insurance Co.*, 142 U.S. 326, 12 S.Ct. 277, 35 L.Ed. 1029 (1892); Bogert, *Law of Trusts* §§ 99, 124 (1973). The few courts which have addressed the issue have held that if no *express* prohibition can be found in the enabling act or pertinent constitutional provisions, then the expenses incurred in maintaining and protecting the trust res are reasonable deductions. *United States v. Swope*, 16 F.2d 215 (10th Cir. 1926); *State ex rel. Greenbaum v. Rhoades*, 4 Nev. 312 (1868); *Betts v. Commissioners of the Land Office*, 27 Okl. 64, 110 P. 766 (1910).

Hence we hold that the statute at issue here is open to two constructions, one of which will render it constitutional, and the petition of the State Treasurer has not carried the burden of clearly showing the unconstitutionality of the statute. I.C. § 58–140 is hereby held to be constitutional.

On July 1, 1985, I.C. § 57–803(n) [1] became effective. Thereafter, pursuant to

---

1. **57–803. Funds recognized or established.—** (1) For all budget, accounting, appropriation, allotment, audit, and other financial report purposes, the following funds, and none other, are

recognized and confirmed in existence, or are established. For all such purposes, the use of accounts within funds is authorized. Accounts

the statute, the State Auditor created three separate accounts in the Agency Asset Funds within which to hold ten percent of the monies received by the Land Board from the leasing of grazing or recreational lands and the sale of timber. Currently, ten percent of the proceeds of these leases or timber sales is being transferred into those special Agency Asset Fund accounts. Since that time the State Treasurer has refused to credit the three agency asset accounts with the interest generated by those accounts, but rather has been crediting the interest generated by those accounts to the general fund. In addition to resisting the writ sought by the State Treasurer herein, the State Land Board has petitioned this Court to order the Treasurer to cease crediting that interest generated by the agency asset funds to the general fund.

The State Treasurer correctly points out there is no specific requirement in I.C. § 58–140 or I.C. § 57–803(n) that interest be paid on any of the agency accounts or that if interest is paid that it be credited to those agency asset accounts. She therefore argues that she is without authority to credit interest to those accounts and that the interest must be credited to the general account pursuant to I.C. § 67–1210 which requires that interest on the investment of idle monies be credited to the general account "unless otherwise specifically required by law."

■ We hold in accordance with the position of the Land Board that the interest earned on the agency asset accounts is an integral part of the total monies received from school lands and must be used for the protection of the lands constituting the trust res or for school purposes in accordance with the terms of the trust established by our Constitution. Crediting such interest generated by the agency asset accounts to the general fund is a violation of the terms of the school endowment grant and our Constitution.

In sum, we hold that I.C. § 58–140, together with I.C. § 57–803(n) do not contravene constitutional restraints, but rather properly carry out the constitutional mandates of ID. CONST. art. 9, § 8. "Implementation of constitutional principles is an appropriate function of legislation, and unless such implementing legislation is clearly in violation of a constitutional principle, it is a valid exercise of the legislative power." *Moon v. Investment Board,* 96 Idaho 140, 525 P.2d 335 (1974).

The petition of the State Treasurer for a writ of mandate or prohibition is denied. State Treasurer is hereby ordered to cease crediting the income generated by the interest on the agency asset accounts to the general account. Costs on appeal to the State Land Board.

DONALDSON, C.J., and BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

Pursuant to I.C. §§ 58–140 and 57–803 the Land Board is diverting into its own bank account ten percent of the funds which are received from the sale and lease of school endowment assets. The Board says: "Not to worry, we use the money for Land Board expenses." One hundred percent of those funds should be going to the Public School Fund. This action by the Land Board is an unconstitutional invasion of the Public School Fund and the majority's determination of this extremely important issue judicially sanctions that invasion.

The Idaho Constitution requires the Public School Fund to remain inviolate and intact. Idaho Const. art. 9, § 3 states:

**Public School Fund to Remain Intact.**—The Public School Fund of the State shall forever remain *inviolate* and

---

may be established only by law or by the order of the state auditor.

. . . .

(n) The agency asset fund is hereby created and established in the state treasury. The agency asset fund is to be used *to account for moneys*

*which are restricted in use or purpose,* and which must be, or may be, invested and accounted for as separate entities, and are not accounted for in any other fund. (Emphasis added.)

*intact;* the interest thereon only shall be expended in the maintenance of the schools of the state, and shall be distributed among the several counties and school districts of the state in such manner as may be prescribed by law. No part of this fund, principal or interest, shall ever be transferred to any other fund, or used or appropriated except as herein provided. The State Treasurer shall be custodian of this fund, and the same shall be securely and properly invested as may be by law directed. The state shall supply all losses thereof that may in any manner occur. (Emphasis added.)

As the majority acknowledges, this Court has recognized in a number of cases that Idaho Const. art. 9, § 3 and §§ 4, 5, and 7 of the Idaho Admission Bill prohibit any attempt by the Legislature or State or Board officers to divert either the principal or interest away from the Public School Fund. *Moon v. Investment Board,* 98 Idaho 200, 560 P.2d 871 (1977); *Engelking v. Investment Board,* 93 Idaho 217, 458 P.2d 213 (1969); *State v. Fitzpatrick,* 5 Idaho 499, 51 P. 112 (1897). *See also United States v. Fenton,* 27 F.Supp. 816 (D.C.Idaho 1939). Yet that is the result of today's case.

As the majority should also know, the words "inviolate" and "intact" are strong words. *Webster's* defines "inviolate" as "free from change." It defines "intact" as "untouched especially by anything that harms or diminishes." Allowing the siphoning off of ten percent of the funds from the sale and lease of the School Endowment assets is definitely changing the fund; in no way can the fund be viewed as remaining "untouched." Accordingly, the clear language of our Constitution is being ignored.

*Moon v. Investment Board, supra,* is controlling. In *Moon,* the Court issued an alternative writ of prohibition to the Investment Board to prohibit it from using monies acquired from the investment of public school funds to *defray its expenses.* As a practical matter, there is little difference between the investment of proceeds by the Investment Board and the management of endowment lands by the State Land Board. Hence, the rule in *Moon* should apply here, which is that pursuant to the Constitution, the Endowment Fund is to remain inviolate; it is also to remain intact; no portion of the principal may be diverted for any purpose, whether that principal be in the form of liquid assets or land.

The majority's attempt at distinguishing *Moon, supra,* is unpersuasive. It argues that the money the Land Board is receiving comes from a different source than the money the Investment Board received. This is a distinction without a difference. The fact of the matter is that both Boards were or are seeking to use money for their own expenses, which originates from the Public School Endowment Fund, and such an attempt is expressly forbidden by our Constitution.

Common sense also dictates a ruling opposite to that of the majority. As a result of today's holding, the Land Board will be able to pay all of its expenses without being required to go through the appropriation process. Accordingly, the expenses it anticipates each year henceforth no longer need be justified before the legislature; thus, accountability will become nonexistent. No controls will exist over the Land Board's expenses account, and nothing requires the Land Board to return any unspent money at the end of a fiscal year. In short, the Land Board now need not answer to anyone for its expense budget, a most unwise and unhealthy state of affairs.

A second concern, also unaddressed by the majority, is the fact that I.C. § 58–140's present provision for a ten percent withdrawal is not cast in concrete. While that may be a fair requirement, equally likely it may not be. The membership of this Court does not include any C.P.A.'s. We are not a board of auditors. Next year a complacent legislature may up the take to 20 percent or 50 percent. All of which concerns today's majority not in the slightest. The majority's reasoning in now approving § 58–140 will be equally applicable to *any*

percentage which an amendment to § 58-140 sets.

A third concern is the fact that there is no discussion about what expenses the Land Board claims. Each of the members of the Board are politically elected officers who presumably have budgeted for expense accounts and staff support to assist them in the special duties pertinent to comprising Land Board membership. It would seem far better that the five offices pool an appropriate share of their own budgets than to fly into the face of a stringent and unyielding constitutional prohibition against invading school endowment properties or funds.

The result of today's opinion nullifies our Constitution, defies common sense, gives the Land Board unchecked power, and leaves open the possibility for the further taking of monies that constitutionally belong in the Public School Fund. I therefore dissent.