899 P.2d 949

SELKIRK–PRIEST BASIN ASSOCIA-
TION, INC., an Idaho Non-profit Corpo-
ration, and Idaho Environmental Coun-
cil, an Idaho Non-profit Corporation,
Plaintiffs–Appellants–Cross Respon-
dents,

v.

STATE of Idaho, ex rel., Cecil ANDRUS,
Governor; Pete T. Cenarrusa, Secretary
of State; Larry EchoHawk, Attorney
General; J.D. Williams, State Auditor;
and Jerry L. Evans, Superintendent of
Public Instruction, as the State Board of
Land Commissioners, and Stanley F.
Hamilton, Department of Lands, All in
Their Official Capacities, Defendants–
Respondents,

and

Intermountain Forest Industry Associ-
ation, Inc., Intervenor–Defendant–
Respondent–Cross Appellant.

No. 20815.

Supreme Court of Idaho,
Coeur D'Alene, October 1994 Term.

May 25, 1995.

Rehearing Denied Aug. 25, 1995.

Landeck, Westberg, Judge & Graham, Moscow, David P. Boswell, Spokane, WA, for appellants. Charles L. Graham and David P. Boswell argued.

Larry EchoHawk, Atty. Gen., Steven J. Schuster, Deputy Atty. Gen., for respondents State of Idaho et al. Steven J. Schuster argued.

Moffatt, Thomas, Barrett, Rock & Field, Chtd., Boise, for intervenor. Stephen R. Thomas argued.

McDEVITT, Chief Justice.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

Selkirk–Priest Basin Association and Idaho Environmental Council (collectively referred to herein as the environmental groups) filed an action against the State Board of Land Commissioners and the Idaho Department of Lands (collectively referred to herein as the Land Board) seeking to challenge the Land Board's decision to sell timber on school endowment trust lands in the Trapper Creek watershed in Bonner and Boundary Counties. The timber sale at issue is known as the Lower Green Bonnet Timber Sale. The environmental groups allege that the Lower Green Bonnet Timber Sale will result in erosion detrimental to Trapper Creek and that the Land Board's state-wide harvest goals will result in deleterious long-term effects to the value of school endowment trust lands. Intervenor–Intermountain Forest Industry Association (IFIA) represents Idaho's timber industry, including the company that successfully bid to purchase the timber at issue.

The Land Board filed for summary judgment claiming that the environmental groups lacked standing to bring an action challenging the Land Board's decision to sell timber on school endowment trust lands. The environmental groups filed a motion to conduct additional discovery in order to better respond to the motion for summary judgment. The additional discovery requested by the environmental groups was limited to the issues of redressability and ripeness of their claim that they would be damaged by the state-wide timber harvest goals of the Land Board.

The district court denied the environmental groups' motion and granted the Land Board's motion for summary judgment. The district court held that the environmental groups lacked standing to challenge the Land Board's action because neither the associations nor their members could show that the Land Board's action would cause the type of individualized injury that could be redressed by the court. The district court also ruled that neither the associations nor their members had standing as the beneficiaries of the Idaho school endowment lands trust or under the public trust doctrine.

The environmental groups appealed, arguing that they have standing to sue the Land Board on all of the grounds rejected by the district court. The environmental groups also appealed the district court's ruling deny-

ing their request to conduct additional discovery in order to resist the summary judgment motion of the Land Board. The environmental groups also raise several issues for the first time on appeal, including their request for attorney fees under the private attorney general doctrine. On cross-appeal, IFIA maintains that the district court improperly considered inadmissible affidavits submitted by the environmental groups.

## II.

## ANALYSIS

### A. Standard Of Review

We begin by re-stating the applicable standard of review:

> In an appeal from an order of summary judgment, this Court's standard of review is the same as the standard used by the district court in ruling on a motion for summary judgment. *Farm Credit Bank of Spokane v. Stevenson,* 125 Idaho 270, 272, 869 P.2d 1365, 1367 (1994); *East Lizard Butte Water Corp. v. Howell,* 122 Idaho 679, 681, 837 P.2d 805, 807 (1992). All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Bonz v. Sudweeks,* 119 Idaho 539, 541, 808 P.2d 876, 878 (1991). Summary judgment is appropriate if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *McCoy v. Lyons,* 120 Idaho 765, 769, 820 P.2d 360, 364 (1991).

*Thomson v. Idaho Ins. Agency, Inc.,* 126 Idaho 527, 887 P.2d 1034 (1994).

### B. The Environmental Groups Do Not Have Standing To Represent The Direct Beneficiaries Of The School Endowment Lands Trust.

■ Although composed of individuals, the environmental groups brought suit in their organizational capacities. Therefore, principles of associational standing as previously outlined by this Court apply:

In Idaho, the elements of associational standing are derived from the United States Supreme Court's analysis of this issue. *Glengary–Gamlin Protective Ass'n v. Bird,* 106 Idaho 84, 675 P.2d 344 (Ct. App.1984). Although some elements of standing in the federal system are colored by the constitutional requirements of a 'case' or 'controversy,' the Supreme Court's analyses of associational standing are instructive. *Id.* at 87, 675 P.2d at 347. The Supreme Court analyses referred to by the *Glengary* court are established in the landmark case of *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

> There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure relief from injury to itself the Association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties. *E.g., NAACP v. Alabama,* 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed.2d 1488] (1958).

> . . . .

> Even in the absence of injury to itself, an association may have standing solely as the representative of its members. *National Motor Freight Assn v. United States,* 372 U.S. 246 [83 S.Ct. 688, 9 L.Ed.2d 709] (1963). . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. *Sierra Club v. Morton,* 405 U.S. 727, 734–41 [92 S.Ct. 1361, 1366–69, 31 L.Ed.2d 636] (1972). So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the case, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

*Warth,* 422 U.S. at 511, 95 S.Ct. at 2211–12.

*Bear Lake Educ. Ass'n v. Board of Trustees of Bear Lake School Dist. # 33*, 116 Idaho 443, 448, 776 P.2d 452, 457 (1989).

The question of standing in this case thus depends on whether either the environmental groups or the members of the environmental groups face "injury." This in turn is determined by whether the groups or the members have a "right to judicial relief" under the relevant "constitutional or statutory provision[s]" at issue. *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206 (footnote omitted). The first provisions under which the environmental groups claim standing are Article IX, §§ 8 and 4 of the Idaho Constitution establishing the school endowment lands trust.

The parties disagree about who are the beneficiaries of the school endowment lands trust established by Article IX, §§ 8 and 4 of the Idaho Constitution. The environmental groups maintain that the schoolchildren are the trust beneficiaries; the Board and the IFIA argue that the beneficiaries of the trust are the school districts and schools. The language of Article IX, § 8 of the Idaho Constitution reads in relevant part as follows:

> **§ 8. Location and disposition of public lands.**—It shall be the duty of the state board of land commissioners to provide for the location, protection, sale or rental of all the lands heretofore, or which may hereafter be granted to or acquired by the state by or from the general government, under such regulations as may be prescribed by law, and in such manner as will secure the maximum long term financial return *to the institution to which granted* or to the state if not specifically granted; provided, that no state lands shall be sold for less than the appraised price. . . .

Idaho Const., art. IX, § 8, as amended (emphasis added).

In *Moon v. State Bd. of Land Commrs.*, 111 Idaho 389, 724 P.2d 125 (1986), this Court explained the relationship between the school endowment lands trust and the public school fund trust in upholding as constitu-

tional a statute allowing for application of up to 10% of the proceeds from endowment land timber sales and grazing leases for maintenance and protection of those lands:

> The State of Idaho manages two separate trusts *for the benefit of public schools.* The Public School Fund is the res of the first trust, which is invested by the Investment Board. I.C. § 57–715 et seq. The State's constitutional responsibilities regarding this trust and the protection of the money corpus are found in ID. CONST. art. 9, § 3. The second trust consists of school endowment lands managed by the Land Board. The endowment lands themselves form the res of this trust and the State's constitutional duties regarding this trust and protection of the land corpus is found in ID. CONST. ART. 9, § 8.

*Moon*, 111 Idaho at 391, 724 P.2d 125 (emphasis in italics added). As *Moon* recognized, the institutional beneficiaries referred to in art. IX, § 8 are the "public schools."

Because the direct beneficiaries of the school endowment lands trust are the schools (or the school districts of which the individual schools are a part), the environmental groups lack the legally protected interest that *Bear Lake* requires. Neither environmental group represents a single school or school district. Consequently, the district court correctly ruled that the environmental groups lack the standing necessary to challenge the administration of school endowment lands trust assets.[1]

### C. The Environmental Groups Presented Sufficient Factual Allegations To Withstand Summary Judgment On Their Claim Of Standing Under The Public Trust Doctrine.

■ The district court analyzed the public trust doctrine claim by holding that whether or not the public trust doctrine applies to the waters of the Trapper Creek drainage is determined by the federal test for commercial navigability. The district court then concluded that because neither the Land Board

---

1. The environmental groups also claim that the public school lands trust is a "charitable trust" relying on *Restatement, Second, Trusts* § 391 (1959), for their position that parties having a

"special interest" can seek enforcement of the trust. However, even if we assumed that to be true, the environmental groups clearly do not have such an interest.

nor any federal court has ever determined Trapper Creek to be navigable under this test, the public trust doctrine does not apply. We do not agree with the district court's reasoning.

Under the public trust doctrine "[t]he State of Idaho holds title to the beds of all navigable bodies of water below the natural high water mark for the use and benefit of the public." *Kootenai Envtl. Alliance v. Panhandle Yacht Club*, 105 Idaho 622, 625, 671 P.2d 1085, 1092 (1983) (footnote omitted). In *Idaho Forest Indus., Inc. v. Hayden Lake Watershed Improvement Dist.*, 112 Idaho 512, 733 P.2d 733 (1987), this Court held that in determining the application of the public trust doctrine, the definition of "navigability" approved in *Southern Idaho F. & G. Ass'n v. Picabo Livestock, Inc.*, 96 Idaho 360, 528 P.2d 1295 (1974), was controlling:

> In *Southern Idaho F. & G. Ass'n*, we affirmed the trial court's definition of navigability as '[a]ny stream which, in its natural state, will float logs or any other commercial or floatable commodity, or is capable of being navigated by oar or motor propelled small craft for *pleasure* or commercial purposes....' 96 Idaho at 362, 528 P.2d at 1297. We also affirmed the trial court's characterization of the navigability test as one simply to determine 'the suitability of a particular water for public use,' 96 Idaho at 363, 528 P.2d at 1298, which use includes ' "fishing, hunting and all recreational purposes." ' *Id., quoting People v. Mack*, 19 Cal.App.3d 1040, 97 Cal.Rptr. 448, 451 (1971), and *citing Day v. Armstrong*, 362 P.2d 137 (Wyo.1961).

*Idaho Forest Indus. v. Hayden Lake Watershed Improvement Dist.*, 112 Idaho 512, 518, 733 P.2d 733, 739 (1987) (emphasis in original).

Against that backdrop, we review the single affidavit presented by the environmental groups on the question of commercial use to determine if it was sufficient to create a material issue of fact concerning navigability

sufficient to withstand summary judgment. The affidavit of J. Allen Isaacson states:

> Based upon my physical observation of the drainage and my survey of the stream channels and their stability with scientific techniques generally accepted by hydrologists, in my opinion the high water mark of the stream channels in their natural state were high enough, and the stream channel configurations were such and water flows were of such volume during some or all of the year that a six in[ch] log would have been carried through the following reaches of Trapper Creek and its tributaries: Trapper Creek from its mouth up to about three thousand feet in elevation, or more than half of the reach of the main fork of Trapper Creek, and the East Fork of Trapper Creek from its mouth up to about the 2800 feet in elevation. Given the history of land use and management of the area, these conditions were present one hundred years ago and longer.

Applying the inferences to which the environmental groups are entitled in opposing summary judgment, we are satisfied that this affidavit is sufficient to raise a material issue of fact regarding whether Trapper Creek is navigable for public trust purposes. We next proceed to determine whether the environmental groups presented evidence raising a material issue of fact supporting their claim that the proposed timber sale will have deleterious impacts on the bed of Trapper Creek below the natural high water mark.[2]

■ In support of their allegation that the proposed timber sale will have negative impacts on Trapper Creek "below the natural high water mark," the environmental groups presented two affidavits of J. Allen Isaacson, a professional hydrologist who had previously testified in other Idaho courts as an expert witness in the field of hydrology. Isaacson's first affidavit included the following allegations and factual assertions based on his personal inspection of the Trapper Creek watershed:

> public lands referenced in Article IX of the Idaho Constitution "do not include the beds of navigable waters of lands thereunder below high-water mark." *Northern Pac. R.R. v. Hirzel*, 29 Idaho 438, 456, 161 P. 854, 859 (1916).

2. The Land Board suggests that the public trust doctrine has no application to Trapper Creek because it belongs to the public school lands trust and the two trusts are mutually exclusive. However, this Court has previously held that the

I looked at the streams and saw serious damage to the stability of the stream system in 1990 with more logging activity under contract yet to be realized. The stream bed and banks were covered with sand that had covered the old bed and banks, which were found by digging through the sand. The high percent of sand and the shifting of the stream bed material is having an effect on the fishery of Trapper Creek and Priest Lake.... Past harvesting and road building coupled with that planned has and will further deplete the assets in Trapper Creek.

. . . .

In Trapper Creek there is going to be more damage when conditions are right, for example under rain-on-snow events. The watershed is too vulnerable to not be effected [sic] now and in the future.

Isaacson's second affidavit prepared in 1992 included the following allegations:

I first reviewed the Trapper Creek watershed from a professional hydrologist point of view in the summer of 1990. On that trip I looked at the East Fork of Trapper Creek and also the main stem above and below where it joins with the East Fork. The stream was unstable and moving large amounts of sand size material through these reaches. I found numerous sources that fed sediment directly into the East Fork from road problems at (sic) and included this in a report I completed that described my findings in the field. The instability was mostly due to the introduced sediment causing the filling of pools and covering spawning gravel with sand causing embededness of the channel material.

. . . .

I could see that the stream stability and the aquatic resources were being stressed beyond where they could recover. The watershed needs a rest and a chance to revegetate, it does not need more timber cutting as is planned with the Lower Greenbonnet (sic) sale. In my 1990 report to SPBA I predicted continued stream instability and degradation due to the road density, the amount of past cutting, and impacts from harvest that is under contract that had not been cut yet. These predictions have come true and were proven with the stream surveys that I completed in 1992. The only surprise was that the damage was much more pronounced and worse than anticipated. When over 80% of a watershed is cut in less than 25 years something has to give, and in this drainage it has been the aquatic habitat and stability.

Reviewed with the benefit of the favorable inferences to which the environmental groups are entitled as parties opposing summary judgment, these affidavits are sufficient to raise a material issue of fact concerning the manner in which the proposed timber sale implicates the public trust doctrine.[3] Isaacson's affidavits allege deleterious impacts within the boundaries of public trust resources caused by past logging practices in the area. More importantly, Isaacson also alleges that the harvesting of the proposed timber sale will cause similar negative effects in the future which will contribute to cumulative damage of public trust resources.

---

**3.** The Land Board and the IFIA filed separate objections pursuant to I.R.C.P. 56(e) to various affidavits submitted by the environmental groups, including the Isaacson affidavits set forth above. The district court considered the affidavits without ruling on the objections by assuming their admissibility. On cross-appeal, the IFIA reurges three objections to the affidavits: (1) the affidavits contain allegations not presented to the Land Board and are therefore inadmissable; (2) the affidavits contain conclusory allegations unsupported by personal knowledge; and (3) the affiants have not established their competency to testify on the matters alleged.

With respect to the Isaacson affidavits, the only affidavits we need consider, these objections are misplaced. Whether or not the factual allegations were put before the Land Board is not a proper basis for an objection under Rule 56 because the public trust doctrine claim is before this Court on appeal from a district court decision made with the benefit of the affidavits. The affidavits establish Isaacson's competency to testify as an expert witness and the portions of his affidavits which we have considered contain opinions within his area of expertise premised on factual allegations of which he has personal knowledge acquired through site inspections. See I.R.E. 702. Therefore, the IFIA's objections do not preclude our review of the above portions of affidavit testimony.

Whether or not this is actually the case is a decision to be made by the trier of fact. Accordingly, we reverse the district court's ruling granting summary judgment in favor of the Land Board on the environmental groups' claim brought under the public trust doctrine only as it relates to public trust resources below the natural high water mark of Trapper Creek.

### D. The Declaratory Judgment Act Does Not Broaden Standing.

■ The environmental groups attempt to argue that the Declaratory Judgment Act somehow broadens the scope of standing. While the Declaratory Judgment Act may potentially expand the scope of remedies available to the environmental groups if they are ultimately successful, it does not relieve them of the obligation to demonstrate that they have standing to bring the action in the first instance. Therefore, the environmental groups' claim that they have standing because a declaratory judgment would resolve the "rights, status, and legal relations existing between the parties" is without merit.

### E. The Claims Under I.C. § 36–1601 and I.C. § 67–4305 Were Not Raised Below.

■ Responding to the respondents' contention that these claims were waived, in their reply brief the environmental groups state that these claims were not waived below. However, the portion of transcript they point to in support of preserving the claim under I.C. § 36–1601 is a discussion of the navigability definition of I.C. § 36–1601[4] in conjunction with their claim under the public trust doctrine, not as an independent basis for relief. Although they also maintain that I.C. § 36–1601 was cited in their brief in opposition to summary judgment, that brief

has not been designated as part of the record on appeal and is therefore not before this Court.

Similarly, the environmental groups only made a single passing reference to I.C. § 67–4305 at oral argument before the district court without arguing that the section provided an independent basis for relief. Because the environmental groups did not assert their claim that I.C. § 36–1601 or I.C. § 67–4305 provides an independent grounds for relief below, we decline to address either argument for the first time on appeal.

### F. Our Holding Renders Moot The Question Of Whether The District Court Abused Its Discretion In Denying The Environmental Groups Request Under I.R.C.P. 56(f) For Additional Discovery On The Issues Of Redressability And Ripeness.

The environmental groups' requests for additional discovery were only directed at gathering additional evidence in support of showing the redressability and ripeness of their claims brought as representatives of the beneficiaries of the public school lands trust. Because we have concluded that the environmental groups lack standing to bring such claims on behalf of the institutional beneficiaries, a threshold prerequisite to any discussion on redressability or ripeness, we do not address this issue.

### G. The Environmental Groups Did Not Raise The Private Attorney General Doctrine Issue Below.

Although the environmental groups state that this claim was raised below, our review of the record on appeal confirms the Land Board's assertion that this claim was waived below.[5]

---

**4.** Moreover, the transcript reference is actually to Title 39. Although the environmental groups now claim this to be a typographical error, no objection to the transcript was filed under I.A.R. 29.

**5.** Even though we do not reach the merits of the environmental groups' private attorney general claim, the Land Board correctly points out an important typographical error in earlier decisions of this Court that state one factor to consid-

er is the "strength or societal importance of the public policy indicated by the litigation." *Compare Hellar v. Cenarrusa*, 106 Idaho 571, 577, 682 P.2d 524, 530 (1984) (citing private attorney general doctrine as adopted from *Serrano v. Priest*, 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303 (1977) but quoting with apparent approval district court's use of "indicated"), *with County of Ada v. Red Steer Drive–Ins*, 101 Idaho 94, 100, 609 P.2d 161, 167 (1980) (correctly quoting *Serrano*'s use of "vindicated"). Accordingly, we take this opportunity to correct these cases.

**246**

## CONCLUSION

The ruling of the district court granting summary judgment in favor of the Land Board is affirmed with the exception of the grant of summary judgment in favor of the Land Board on the environmental groups' claim under the public trust doctrine; that ruling is reversed as set forth above. No costs on appeal.

TROUT and SILAK, JJ., and LEGGETT, J. Pro Tem., concur.

JOHNSON, Justice, concurring in part and dissenting in part.

I concur in all of the Court's opinion except part II(B) (The Environmental Groups Do Not Have Standing to Represent the Direct Beneficiaries of the School Endowment Lands Trust.). In my view, the Court incorrectly identifies school districts as the direct beneficiaries of the school lands trust. In my view, the students in the common schools are the beneficiaries.

In declaring that school districts are the direct beneficiaries of the school lands trust, the Court focuses on the portion of art. 9, § 8 of our constitution referring to "the maximum long term financial return to *the institution to which granted.*" (Emphasis added.) These words were added to our constitution in 1982. 1982 Idaho Sess.L., H.J.R. 18, 935, 936. This was more than ninety years after the Idaho Admissions Bill granted land to the state "for the support of common schools." 26 Stat.L. 215, ch. 656, § 4 (1890). In *American Nat. Bk. v. Joint Ind. S. Dist.*, 61 Idaho 405, 411, 102 P.2d 826, 828 (1940), the Court pointed out that "the duty of maintaining the public schools is imposed by the Constitution as a primary and fundamental duty of state government; (Sec. 1, art. 9, Const.) and the organization and maintenance of the districts is purely a matter of administrative convenience in the execution of the constitutional mandate." In my view, therefore, the school districts are not the beneficiaries of the school lands trust. The true beneficiaries are those who benefit from the state's constitutional duty to maintain common schools—the students. The environmental groups have standing to bring

this action on behalf of students, whose parents are members of the groups.