SUBSTITUTE OPINION
THE COURT’S PRIOR OPINION DATED DECEMBER 1, 2010 IS HEREBY WITHDRAWN.
HORTON, Justice.
This matter comes before this Court on a petition for issuance of a writ of prohibition, filed by Attorney General Lawrence Wasden. Wasden seeks a writ of prohibition to stop the Director of the Idaho Department of Lands (IDL) George Bacon from executing new lease agreements on recreational home sites located on Priest Lake and Payette Lake (cottage sites). Wasden argues that the proposed lease agreements (cottage leases) for the cottage sites violate both the Idaho Constitution and I.C. § 58-310A by: (1) failing to secure the maximum long-term *548 financial return for the beneficiaries of the Idaho public lands trust; and (2) failing to generate market rent. Respondents have moved to dismiss the petition, arguing that the decision of the Idaho State Board of Land Commissioners (the Land Board) regarding rental rates was not in excess of its discretion and that issuance of a writ of prohibition is inappropriate due to the availability of other remedies. Because we find that there is a plain, speedy and adequate remedy in the ordinary course of law, we do not reach the question of whether the State Board of Land Commissioners (the Board) is attempting to act in excess of its jurisdiction, and dismiss the petition for writ of prohibition.
I. CONSTITUTIONAL AND STATUTORY BACKGROUND
The federal government granted federal lands to the Idaho Territory, later the State of Idaho, through § 4 of the Idaho Admission Bill of 1890, for the purpose of supporting public education. Article IX, section 7 of the Idaho Constitution established the State Board of Land Commissioners, comprised of the governor, superintendent of public instruction, secretary of state, attorney general and state controller. The Board is given “the discretion, control and disposition of the public lands of the state, under such regulations as may be prescribed by law.” Id. Article IX, section 8 of the Idaho Constitution states, inter alia:
It shall be the duty of the state board of land commissioners to provide for the location, protection, sale or rental of all the lands heretofore, or which may hereafter be granted to or acquired by the state by or from the general government, under such regulations as may be prescribed by law, and in such manner as will secure the maximum long-term financial return to the institution to which granted or to the state if not specifically granted____
Idaho Code § 58-304 governs the leasing of state lands, and provides, inter alia, “[t]he state board of land commissioners may lease any portion of the state land at a rental amount fixed and determined by the board.” Idaho Code § 58-310(1) states:
When two (2) or more persons apply to lease the same land, the director of the department of lands, or his agent, shall, at a stated time, and at such place as he may designate, auction off and lease the land to the applicant who will pay the highest premium bid therefore, the annual rental to be established by the state board of land commissioners.
However, the cottage sites were specifically exempted from the conflict auction requirement by I.C. § 58-310A, wherein the legislature determined that the stability gained by continuing to lease the cottage sites to existing long-term lessees was the best means of achieving the maximum long-term financial return to the beneficiaries. Specifically, I.C. § 58-310A provides that “[i]n the absence of the conflict application and auction procedure in the single family, recreational cottage site and homesite lease, and lease renewal process, the board shall insure that each leased lot generates market rent throughout the duration of the lease.”
Idaho Code § 58-101 established the IDL as the executive agency charged with assisting the Board in carrying out its constitutional duty of administering state endowment lands. IDL’s powers and responsibilities are set forth in I.C. § 58-119. George Bacon is the Director of IDL (Director). The Director of IDL is tasked with countersigning leases issued by the president of the Board for rental of state endowment lands, pursuant to I.C. § 58-121.
Section 20.03.13 of the Idaho Administrative Procedure Act (IDAPA) provides the specific structure that is employed in the leasing of the state endowment lands. IDA-PA 20.03.13.027 is titled “equity sharing premium rental” and states that:
Equity sharing premium rental shall be required through December 31, 1992 or until contract rents have been increased to full market rents, whichever comes first, and is due and payable prior to lease assignment and/or transfer and shall be computed as follows: Assignment Payment. All assignments and/or transfers shall pay a rate of ten percent (10%) of the leasehold value as determined under Section 025.
*549 II. FACTUAL AND PROCEDURAL BACKGROUND
Each cottage site is owned in fee simple by the State of Idaho, and held in trust for the benefit of the public schools, normal schools (Idaho State University, Department of Education, and Lewis-Clark State College), and the state hospital (collectively “the Beneficiaries”). The Board began renting cottage sites in Idaho in 1924, but the majority of lots were not leased until sometime between the mid 1940’s and early 1950’s. The State originally leased the cottage sites as bare land, and the cottage site lessees (Lessees) themselves constructed homes and other structures and improvements upon the land for them own use and benefit. From 1945 to 1988 cottage sites were leased for flat rates, with sporadic adjustments (generally rates were adjusted every three-to-five years, with an extreme of fourteen years between adjustments).
The Board has long allowed the Lessees to sell or assign their leasehold interests to others for profit. IDAPA 20.03.13.010.06, defines “Leasehold Value” as “[t]he value which accrues to a leasehold estate when the contract rent is below the market rent.” This proposition has also been recognized by IDL and its former and current directors, former and current members of the Board, and professional appraisers. Leasehold values are determined by subtracting the value of improvements and personal property from the total sales price. IDAPA 20.03.13.025.
As leasehold values grew it became clear to the Board that it was not achieving market rent, and in 1981 the Board invented the concept of “premium rent” to try to decrease the amount of profit the Lessees were reaping from the gap between actual and market rent. The term “premium rent” is a misnomer; it would be more accurate to refer to this mechanism as a “leasehold transfer fee.” Premium rent requires that the lessee pay the State a certain percentage of the value that the lessee receives from selling his leasehold interest in a cottage site.[1] In 1981 this percentage was set at 10%. So, for example, if a lessee sold his leasehold for $160,000 and had placed $60,000 of improvements and personal property on the land, the leasehold value would be $100,000. Of that $100,000 the State would be entitled to $10,000 and the remaining $90,000 would go to the selling lessee. Premium rent was conceived of as a temporary measure, the utility and impact of which would disappear as rents reached fair market value. In fact the IDAPA provision establishing premium rent — IDAPA 20.03.13.027 — reproduced above, expired on December 31, 1992. Nevertheless the Board and IDL have continued to apply premium rent to leasehold sales.[2]
In 1986, a study by IDL showed that the State was receiving a rate of return on the cottage sites of approximately .67% per year. In an attempt to increase the return for the Beneficiaries the Board abandoned the flat rental rates and instead adopted a rental rate target at 2.5% of each cottage site’s appraised value, to be phased in (incrementally increased) over a ten-year period.
From 1905 until 1991 the cottage sites were subject to conflict auctions pursuant to 1.C. § 58-310, and its statutory predecessors. Idaho Code § 58-310 provides that, when a lease term expires and more than one party makes application to lease the property, an auction is held amongst the applying parties to determine which is willing to pay the most to lease the property. Despite having been subject to this provision, no conflict auction had been carried out on a cottage site until 1990. It is likely that this apparent lack of interest was attributable to lack of public awareness, largely due to the fact that the Board had a policy against advertising when cottage leases were expiring, and posted notices of availability only on the local court house bulletin board. In 1990 the Board received conflicting applications for two dif *550 ferent cottage sites, where both the existing lessees and an outside party applied to lease. Instead of holding a conflict auction as I.C. § 58-310 required, IDL requested that the legislature draft legislation exempting cottage sites from I.C. § 58-310. As a result, I.C. § 58-310A was passed, eliminating conflict auctions as a means of establishing the maximum long-term financial return and instead requiring that the Board ensure that the cottage leases generate market rent throughout their duration.
Following the passage of I.C. § 58-310A in 1991, the Board reexamined the rental rates charged for cottage sites in order to comply with the statutory mandate of obtaining market rent. In order to ascertain market rent, the Board employed a consulting group to perform appraisals on 13 cottage sites at Payette Lake and 16 cottage sites at Priest Lake. After conducting these appraisals the consulting group recommended variable rental rates, from 4.5% of market value for some cottage sites, up to 5.5% for others. A subcommittee appointed by the Board considered the consultant recommendations, but nevertheless recommended that the Board continue the already implemented 2.5% rental rate, with a target rent based on the 1992 appraisal, phased in over 10 years. One Board member expressed his discomfort with ignoring the consultant’s recommendations, warned that not setting a new target rate for 10 years would place the cottage leases even further below market rent than they already were, and stated that the phase-in schedule for rent must be abandoned in order to “generate market rent throughout” the lease term, as required by I.C. § 58-310A IDL also advised the Board against freezing the target rental rate at the 1992 appraised values. The Board nevertheless voted to implement the subcommittee’s recommendations.[3]
By 1997, leasehold values had escalated sharply[4] and for some cottage sites the local property taxes actually exceeded the rent IDL was collecting from the Lessees. The escalating property value, coupled with the 5.3% cap on rent increases from year-to-year, meant that the return on the cottage sites was only slightly higher than it had been in 1986, at 1%. IDL concluded that it was quite apparent that the rent being collected under the cottage leases was below market rent. IDL concluded that all available market data suggested that market rent would be somewhere between 3% and 5%, noting that most data supported a 5% rate.[5] IDL concluded that the Board would not be complying with its constitutional duty if it continued with its existing rental formula. The Board nonetheless voted to continue the 2.5% rate, though it did create a new target rent based on the most recent property assessment — to be updated on an annual basis — eliminated the phase-in period, and removed the yearly cap on rent increases.[6]
Following its 1997 vote, the Board commissioned appraisals of the cottage sites on each lake, asking the appraisers to determine market rent. The appraisers recommended a rental rate of 3.5% at Priest Lake and between 4% and 6% at Payette Lake. In 1998 a subcommittee of the Board met to consider the recommendations of the appraisers and IDL. After recognizing the strong support in market data for rates of 3.5% at Priest Lake and 4% at Payette Lake, the subcommittee nevertheless recommended that the Board maintain the 2.5% rate, as it “recognizes and takes into consideration the lessees’ sweat equity and site improvements.” Rental rates have ostensibly remained at 2.5% since 1998.
*551 Due to escalating property values around the cottage sites at Payette Lake, the 2.5% rate called for increases in rental rates of between 48% and 87% from 2007 to 2008. In response to these large pending increases the Board voted to freeze Payette Lake cottage site rental rates at the 2007 level. The rental rate formula called for an increase in rent for both the Payette Lake and Priest Lake cottage sites from 2008 to 2009, but the Board voted to freeze rents at the 2008 level (which was really the 2007 level for the Payette Lake cottage sites, due to the freeze the year before). For 2010 the Board again froze rent, leaving the 2007 rate in effect at Payette Lake and the 2008 rate in effect at Priest Lake.
On June 12, 2007, the Board appointed Secretary of State Ysursa and Superintendent of Public Education Luna to a subcommittee (the Cottage Site Subcommittee) tasked with making recommendations to the Board on market rate for the cottage sites. The goal of the Cottage Site Subcommittee was to recommend an updated rental formula to be included in cottage leases for the ten-year lease term to begin on January 1, 2011.
The Cottage Site Subcommittee recommended a new lease structure with annual rent set at 4% of the average market value of each cottage site over the previous 10 years, to be updated annually (the so-called “rolling average”). However, the 4% rolling average would not be reached until the end of a 5-year phase-in period during which rent would be incrementally increased from its current level to the target rent. The new cottage leases would also include premium rent, though under a more complicated formula than that previously employed. The Cottage Site Subcommittee recommended that “premium rent be calculated at 10% of the gross leasehold value or 50% of the net leasehold value, whichever is the greater amount for the endowment.” The Cottage Site Subcommittee explained that “[n]et leasehold value shall be calculated by subtracting the original leasehold value (sales price less the value of tenant improvements) of the lessee who is transferring the lease from the leasehold value (sale price less the value of tenant improvements) when a transfer occurs.”
The Director of IDL analyzed the Cottage Site Subcommittee recommendations and determined that the rolling average system of determining rental rates would result in actual return being approximately 2.4% assuming land value appreciates at 4.8% a year, or 1.5% if land appreciates at 10.3% annually. The Director concluded “I do not believe the Subcommittee’s recommendation ensures that each leased lot generates market rent throughout the duration of the lease, but neither does the current system.” On March 16, 2010, the Board voted 3-2 for the new lease structure as recommended by the Cottage Site Subcommittee.
On March 24, 2010, Attorney General Was-den submitted a Verified Petition for Issuance of a Writ of Prohibition with this Court. Wasden alleges that the Board, of which he is a member, is acting in excess of its jurisdiction under the Idaho Constitution and statutory law in attempting to lease state endowment lands for less than market rent.
On April 8, 2010, the Board submitted a Motion to Dismiss with this Court, pursuant to Idaho Rule of Civil Procedure 12(b)(6). The Board argues that Wasden has failed to state a claim upon which relief may granted. In the Board’s Memorandum in Support of Motion to Dismiss, filed the same day as the Motion to Dismiss, it argues that Wasden failed to demonstrate either of the two requisites that must be established in order for this Court to issue a writ of prohibition.
This Court heard oral argument on June 9, 2010.
III. STANDARD OF REVIEW
In Henry v. Ysursa, we explained:
This Court has original jurisdiction to issue writs of prohibition. Idaho Const. Art V, § 9. “The writ of prohibition is not a remedy in the ordinary course of law, but is an extraordinary remedy.” Maxwell v. Terrell, 37 Idaho 767, 774, 220 P. 411, 413 (1923). Before this Court will issue such writ, two contingencies must be shown: “the tribunal, corporation, board or person is proceeding without or in excess of the jurisdiction of such tribunal, corporation, board, or person, and that there is not a *552 plain, speedy, and adequate remedy in the ordinary course of law.” Olden v. Paxton, 27 Idaho 597, 600, 150 P. 40, 41 (1915). The word “jurisdiction” when used in reference to a writ of prohibition includes the power or authority conferred by law. Crooks v. Maynard, 112 Idaho 312, 319, 732 P.2d 281, 288 (1987) (where administrative orders were within the “power and authority” of the administrative district judge, a writ of prohibition would not issue); Stein v. Morrison, 9 Idaho 426, 455, 75 P. 246, 256 (1904) (quoting from Maurer v. Mitchell, 53 Cal. 289, 292 (1878)) (“The word ‘jurisdiction,’ when used in connection with ‘prohibition,’ would be at once understood as being employed in the sense of the legal power or review.” State v. District Court, 143 Idaho 695, 699, 152 P.3d 566, 570 (2007)).
148 Idaho 913, 915, 231 P.3d 1010, 1012 (2008). The party seeking the writ of prohibition carries the burden of proving the absence of that adequate, plain, or speedy remedy. See Edwards v. Indus. Comm’n, 130 Idaho 457, 460, 943 P.2d 47, 50 (1997) (applying the identical “plain, speedy, and adequate” requirement for writs of mandate).
IV. ANALYSIS
As noted above, “[wjrits of prohibition are extraordinary and are issued with caution.” Gibbons v. Cenarrusa, 140 Idaho 316, 318, 92 P.3d 1063, 1065 (2002). Without reaching the question of whether the Land Board has proceeded in excess of its jurisdiction, we find that there is “a plain, speedy, and adequate remedy in the ordinary course of law” as required by I.C. § 7-402, a remedy that is available by means of joining an action for declaratory judgment with a request for injunctive relief.
The use of the word “plain” in the statute has a readily apparent meaning. The remedy must be evident, obvious, simple or not complicated. For lawyers desirous of having another party act or refrain from acting in a specified manner, a request for injunctive relief is the obvious course of action. This Court has long recognized that a party may join an action for declaratory judgment with a prayer for injunctive relief. Indeed, during the seventy year history of cases in which this Court has considered appeals involving such joined claims, starting with Century Distilling Co. v. Defenbach, 61 Idaho 192, 99 P.2d 56 (1940) and ending most recently in Lattin v. Adams Cnty., 149 Idaho 497, 236 P.3d 1257 (2010), this Court has never questioned the propriety of joining such actions.[7]
Thus, the only remaining question is whether injunctive relief is a sufficiently “speedy” remedy. We are convinced that the availability of preliminary injunctive relief is sufficiently “speedy” as to warrant denial of the requested writ of prohibition.
The plaintiff in such an action[8] would be entitled to a preliminary injunction upon a showing that it appears that there is entitlement to relief and such relief would consist of “restraining the commission or continuance of the acts complained of....” I.R.C.P. 65(e)(1). While injunctions are equitable in nature, they are within the scope of the “adequate remedies] in the ordinary course of law” contemplated by I.C. § 7-402. See Butters v. Hauser, 131 Idaho 498, 501, 960 P.2d 181, 184 (1998) (“The existence of an adequate remedy in the course of legal procedure, either legal or equitable in nature, *553 will prevent the issuance of a writ of mandamus.”). A preliminary injunction would prevent the threatened harm which underlies the presently requested writ of prohibition. Assuming that the plaintiff is successful in persuading the district court of the merits of its position, it would be entitled to a declaration that the Land Board’s actions did not comply with I.C. § 58-310A or Article IX, section 8 of the Idaho Constitution. Permanent injunctive relief would then be appropriate.
In short, we agree with the reasoning of the Idaho Court of Appeals’ decision in Agricultural Services, Inc. v. City of Gooding, 120 Idaho 627, 818 P.2d 331 (Ct.App.1991) (“ASI ”). In ASI, the court observed that, as of 1991, the decisions of this Court which recognized the writ of prohibition as a “proper and appropriate remedy for violations of statute by a public body or official” predated the adoption of the declaratory judgment act. Id. at 629, 818 P.2d at 333. While this Court has not shown much hesitanee to issue writs of prohibition in the years since ASI was decided, those decisions have conspicuously failed to closely examine the question of a “plain, speedy, and adequate” alternative. Without discussing each of these eases, we simply observe that this Court never addressed this requirement in view of the availability of declaratory and injunctive relief.
It is a principle of universal application, and one which lies at the very foundation of the law of prohibition, that the jurisdiction is strictly confined to cases where no other remedy exists; and it is always a sufficient reason for withholding the writ, that the party aggrieved has another and complete remedy at law.
Taylor v. Girard, 54 Idaho 787, 792, 36 P.2d 773 (1934) (quoting Kabadian v. Doak, 65 F.2d 202 (Ct.App.D.C.1933)). The avenues of preliminary and declaratory injunctive relief fit this description.
In so holding, we note that injunctive relief will be at least as effective as the issuance of the writ and, arguably, will be more effective. The Court’s issuance of the writ of prohibition would not, itself, determine what appropriate market rates are. Rather, a grant of the writ would merely conclude that the new leases do not comply with the requirements of I.C. § 58-310A. Any decision of what the proper rental rates are or should be would be left to future action of the Land Board.
“ [Prohibition arrests proceedings which are without or in excess of the jurisdiction” possessed by the court or body in question, Stein v. Morrison, 9 Idaho 426, 455, 75 P. 246, 256 (1904), and serves to preserve the status quo wherein the court or body is acting within its jurisdiction. The Attorney General’s position is based upon the premise that the Land Board has never complied with the requirements of I.C. § 58-310A Thus, there is no status quo wherein the Land Board has acted within its jurisdiction to be preserved. We have always said that the writ of prohibition is “granted only when the court is satisfied that the remedy is appropriate.” Clark v. Ada Cnty. Bd. of Comm’rs, 98 Idaho 749, 752, 572 P.2d 501, 504 (1977); see also Pfirman v. Probate Court of Shoshone Cnty., 57 Idaho 304, 309, 64 P.2d 849, 850 (1937) (“Being an extraordinary writ, it should not issue in doubtful cases ____”) (quoting Rust v. Stewart, 7 Idaho, 558, 561, 64 P. 222, 223 (1901)).
This Court has also stated that the writ will not issue when its “effectiveness is doubtful.” Clark, 98 Idaho at 752, 572 P.2d at 504. The legal issues presented by the Attorney General’s claims involve the scope of the Land Board’s discretion to determine “market rent” as required by I.C. § 58-310A The determination of “market rent” is fundamentally a factual determination although the statements of three-fifths of the membership of the Land Board do indicate that the leases in question do not achieve the level of market rent. Were we to issue the writ under these circumstances, it would certainly serve to warn the members of the Land Board to exercise caution in stating their views as to whether future lease terms comply with the requirements of I.C. § 58-310A, but it would not otherwise serve to prohibit future conduct in violation of the Land Board’s statutory or constitutional duties. In Clark, this Court stated that a writ of prohibition will not issue unless “the writ will effectively prevent the respondent” from acting without or in excess of its jurisdiction. *554 Id. If the writ will not have this effect, it will not be issued as it would merely be an idle gesture. Id. Instead, in an action for declaratory and injunctive relief, the district court will be in the best possible position to assess the fundamental factual question of whether the Land Board has violated its duties as trustee under Article IX, section 8, its statutory duties under I.C. § 58-310A, some combination thereof, or whether it has acted within its discretion.
As there is a plain, speedy, and adequate remedy available and because issuing the requested writ will not be any more effective in addressing the underlying questions, we grant the Land Board’s motion to dismiss.
V. CONCLUSION
We grant the Land Board’s motion to dismiss, finding that there is a plain, speedy, and adequate remedy in the ordinary course of law such that the extraordinary remedy of a writ of prohibition would be improper.
Chief Justice EISMANN and Justice Pro Tem TROUT concur.

. Premium rent is only collected when a lessee transfers his leasehold for profit — in excess of the money he expended in developing the property. Where a lessee assigns his leasehold interest to another for no money there is no premium rent, as there is no basis upon which to determine leasehold value.

. A report prepared by a subcommittee that was appointed by the Board, shows that from 2003 until approximately 2010, leasehold transfers brought in over $25,000,000 for lessees, but only $2,700,000 for the Beneficiaries.

. In fact, far from removing the phase-in schedule, the Board further restricted the rate at which rent could increase from year to year. The Board had previously capped rent increases at 25% over the previous year's rent, but elected to lower that cap to 5.3%.

. In 1994 leaseholds for lakefront cottage sites at Payette Lake were averaging nearly $285,000, non-lakefront cottage sites at Payette Lake were averaging $59,000, and lakefront sites at Priest Lake were averaging slightly over $96,000.

. IDL noted that the current 2.5% rate "is supported only through an earlier appraisal which reveals that Newport Beach City, California has an actual rate of return of 1.8% to 2.5%.”

. The Board also implemented a "hardship provision” under which "any lessee forced to sell due to escalating rental could ask for deferment of any increase in rental for a period of up to three years. Payment of deferred rent would be due upon sale of the leasehold or at the expiration of the deferment.”

. The dissent writes that "a stay or injunction would only perpetuate [any violation by the land board], not remedy it in an adequate manner____” We note that a writ of prohibition is not inherently superior to injunctive relief as a remedy. A court’s order enjoining behavior is enforceable in precisely the same manner as that of a writ of prohibition. Enforcement of either can only come through exercise of the court’s contempt powers.

. The dissent’s argument that declaratory or injunctive relief will not be available to Wasden is effectively a suggestion that he lacks standing. There has been no suggestion by the parties to this action that Wasden lacks standing to seek a writ of prohibition and, without the benefit of briefing from the parties, we can discern no evident basis to conclude that Wasden has standing to obtain the requested writ of prohibition while similarly lacking standing before the district court. Without deciding the question whether Wasden would have standing to seek declaratory or injunctive relief, it is evident that the beneficiaries would have standing. Selkirk-Priest Basin Ass’n, Inc. v. State ex re. Andrus, 127 Idaho 239, 242, 899 P.2d 949, 952 (1995).